721 So.2d 1155 (1998)
James GUZMAN, Appellant,
v.
STATE of Florida, Appellee.
No. 89640.
Supreme Court of Florida.
October 1, 1998.
Rehearing Denied December 15, 1998.
*1156 Gerard F. Keating, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
On January 7, 1992, James Guzman was indicted for the murder and armed robbery of David Colvin. Following a jury trial, Guzman was convicted as charged and sentenced to death. This Court subsequently reversed Guzman's convictions and death sentence and remanded for a new trial, holding that Guzman's right to a fair trial was violated because his public defender had a conflict of interest. Guzman v. State, 644 So.2d 996 (Fla.1994). Guzman was retried and again convicted and sentenced to death. We now address Guzman's appeal from the second trial. We have jurisdiction. Art. V, *1157 § 3(b)(1), Fla. Const. We affirm the convictions and death sentence.

FACTS
The record of Guzman's second trial reflects the following facts. David Colvin's body was discovered lying face down on the bed of his motel room on August 12, 1991. He had nineteen stab, incised, and hack wounds to his face, skull, back, and chest, and a defensive wound to a finger on his left hand. A skull fragment was found on the floor at the foot of the bed. Colvin's bed was soaked in blood and a large amount of blood spatter coated the walls of the room within two to three feet of the body. A bent and twisted samurai sword was found on a light fixture above the bed. No blood or fingerprints were found on the sword. However, Guzman's fingerprints were found on the telephone in the room. Colvin's blood alcohol level was determined to be .34 at the time of his death.
Dr. Terrance Steiner, the interim medical examiner for Volusia County, viewed the murder scene. Dr. Steiner testified that the weapon used to kill Colvin was a single-edged knife or knife-like object with a slightly curved, heavy blade. He stated that the incised wounds to Colvin's face and skull were consistent with a blade being drawn over an area rather than stabbed into it. Dr. Steiner testified that the defensive wound was the type suffered by a person attempting to block a blow with his hand. He further testified that the sword recovered from the room could have inflicted some of the wounds to Colvin's body, and that a survival knife like the one owned by Guzman could have inflicted other wounds. Dr. Steiner said that Colvin died as a result of loss of blood and that none of his wounds would have been immediately fatal. Based on the pattern of the wounds and the defensive wound, Dr. Steiner opined that Colvin was conscious during at least the onset of the attack. Dr. Steiner said that the fact that Colvin was intoxicated at the time of the attack did not affect his opinion that Colvin was conscious during the assault and attempting to defend himself. Dr. Steiner estimated that Colvin died between 3 p.m. and midnight on August 10.
Leroy Parker, a crime scene analyst with the Florida Department of Law Enforcement (FDLE), testified that the blood stains found in the room indicated that most of Colvin's wounds were inflicted while he was lying on the bed in a defensive position with his head elevated within a distance of twelve inches from the bed. Parker further testified that the large amount of blood spatter on the walls of the room suggested that the killer was swinging the weapon. Parker stated that the sword found at the crime scene was consistent with the blood spatter evidence.
Approximately one week prior to the murder, Guzman and Martha Cronin, a prostitute and crack cocaine addict, began living together at the Imperial Motor Lodge. Colvin also resided at the motel, and Guzman and Colvin became acquainted. On the morning of August 10, Colvin and Guzman left the hotel in Colvin's car. Guzman and Colvin first proceeded to a tavern and drank beer, then the men went to the International House of Pancakes and ate breakfast. Guzman testified that he and Colvin returned to the motel at approximately 12 noon. Guzman stated that he gave Colvin's car and room keys back to Colvin and returned to his room. Guzman testified that at approximately 3 p.m. Curtis Wallace gave him a diamond ring that he could sell or trade for drugs. Guzman admitted that he gave the ring to Leroy Gadson in exchange for drugs and money. However, Guzman denied any involvement in Colvin's robbery and murder.
Cronin's trial testimony contradicted Guzman's. Cronin testified that Guzman told her prior to the murder that Colvin would be easy to rob because he was always drunk and usually had money. Cronin stated that Guzman told her in another conversation that if he ever robbed anybody, he "would have to kill them" because "a dead witness can't talk." Cronin testified that Guzman was holding his survival knife at the time this statement was made. Cronin claimed that, on the morning of August 10, Guzman told her that he was going to drive Colvin to the bank. Cronin stated that Guzman returned to their room that morning and showed her *1158 Colvin's car keys and room keys. Cronin testified that at approximately 3 p.m. Guzman appeared at their room with a garbage bag that contained rags. Cronin said that Guzman looked upset, and that she asked him what was wrong. Cronin testified that Guzman responded, "I did it," and confessed to murdering Colvin. Cronin stated that Guzman told her that Colvin awakened while he was taking money from Colvin's room. Cronin testified that Guzman said that he hit Colvin in the head and then stabbed him with the samurai sword. Cronin stated that Guzman showed her a diamond ring and money that he had taken from Colvin. Cronin also stated that Guzman said he committed the murder for her.
Upon questioning by the police shortly after the discovery of Colvin's body, Guzman and Cronin both claimed to know nothing about the murder. In the latter part of November 1991, Cronin informed the police that Guzman had confessed to her that he killed Colvin. Cronin testified that Guzman had instructed her to tell the police that she knew nothing about the murder. Cronin also testified that she did not come forward earlier because Guzman threatened to harm her if she revealed what she knew about the crime. Guzman admitted that he told Cronin prior to his first trial to "do the right thing girl it's a small world." Paul Rogers and Guzman became friends while sharing a jail cell in the Spring of 1992. Rogers testified that Guzman confessed to him that he robbed and killed Colvin. Rogers said that Guzman told him that he used Colvin's key to enter his room after the men returned from drinking, and that Colvin awakened while Guzman was robbing him. Rogers further testified that Guzman stated that, after Colvin sat up in the bed, Guzman struck Colvin ten or eleven times with the sword. Rogers stated that Guzman said he cleaned the sword and put "everything" in a garbage bag which he disposed of in a dumpster. Rogers also stated that Guzman admitted that he took Colvin's ring and some money and traded the ring for drugs. Guzman allegedly told Rogers that he robbed and killed Colvin so Cronin would not have to earn money as a prostitute. Rogers said that Guzman threatened to kill him and his family if he informed the police about his knowledge of the murder.
Guzman was arrested for Colvin's murder on December 13, 1991. He had a survival knife in his possession at the time of his arrest. The police subsequently recovered Colvin's ring. Guzman's second trial began on December 2, 1996. In this trial, Guzman waived his right to a jury in both the guilt and penalty phases of the trial.[1] The trial court convicted Guzman of first-degree murder and armed robbery and imposed a death sentence. In its sentencing order, the trial court found the following five aggravating circumstances: (1) Guzman was previously convicted of a felony involving the use of violence; (2) the murder was committed in the course of a robbery; (3) the murder was committed for the purpose of avoiding arrest; (4) the murder was committed in a cold, calculated, and premeditated manner (CCP); and (5) the murder was especially heinous, atrocious, or cruel (HAC). The trial court found no statutory mitigating circumstances. As nonstatutory mitigation, the court found that Guzman's alcohol and drug dependency was established, but was entitled to little weight.
Guzman now appeals his convictions and death sentence. Guzman raises eight issues on appeal to this Court.[2] Three of Guzman's claims are without merit and do not warrant *1159 discussion.[3] Of the claims that merit discussion, one relates to the guilt phase of Guzman's trial and four pertain to the penalty phase.

GUILT PHASE
Guzman claims that the evidence is insufficient to sustain his conviction for first-degree murder. Guzman essentially challenges the credibility of witnesses Cronin and Rogers and argues that Dr. Steiner's testimony is inconsistent with the judgment of conviction. We reject Guzman's claim. First, it is the province of the trier of fact to determine the credibility of witnesses and resolve factual conflicts. Melendez v. State, 498 So.2d 1258, 1261 (Fla.1986); Jent v. State, 408 So.2d 1024, 1028 (Fla.1981). Sitting as the trier of fact in this case, the trial judge had the superior vantage point to see and hear the witnesses and judge their credibility. Our review of the record convinces us that the judge performed his fact-finding function properly.
Second, this Court will not reweigh the evidence when the record contains sufficient evidence to prove the defendant's guilt beyond a reasonable doubt. Melendez, 498 So.2d at 1261; Tibbs v. State, 397 So.2d 1120 (Fla.1981). The record in this case reveals the following facts: Cronin testified that Guzman had told her that Colvin would be easy to rob and that if he ever robbed anyone he would kill them. Cronin and Rogers testified that Guzman confessed to murdering Colvin. Guzman told Cronin that Colvin woke up while Guzman was in the process of robbing him. Guzman stated that he hit Colvin in the head and proceeded to stab him with the samurai sword. Guzman showed Cronin the ring he had taken from Colvin. At a later date, Guzman again confessed Colvin's murder to Cronin and told her that he killed the victim for her. Rogers' testimony was remarkably similar to Cronin's. Rogers testified that Guzman told him that Colvin woke up while Guzman was robbing him. Guzman told Rogers that he hit Colvin in the head with the sword and stabbed him ten or eleven times. Guzman also told Rogers that he took Colvin's ring and approximately $600 and cleaned up "everything." It is undisputed that Guzman possessed Colvin's ring and traded it for drugs and money. Finally, Dr. Steiner testified at trial that the sword and Guzman's survival knife were consistent with the murder weapon. We find that the record demonstrates Guzman's guilt.

PENALTY PHASE
In the first penalty-phase claim, Guzman argues that the trial court erred in finding in aggravation that the murder was especially heinous, atrocious, or cruel. Guzman asserts that Colvin's blood alcohol level of .34 at the time of his death indicates that he was heavily impaired and likely unconscious during the attack. Guzman also states that there is no evidence to support that Colvin was intentionally made to suffer. Guzman contends that the HAC aggravating circumstance is not present unless it is demonstrated that the murder was intended to be extraordinarily painful.
The HAC aggravator applies only in torturous murdersthose that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. Kearse v. State, 662 So.2d 677 (Fla.1995); Cheshire v. State, 568 So.2d 908 (Fla.1990). The crime must be conscienceless or pitiless and unnecessarily torturous to the victim. Richardson v. State, 604 So.2d 1107 (Fla. 1992); Hartley v. State, 686 So.2d 1316 (Fla.1996). The HAC aggravating circumstance has been consistently upheld where the victim was repeatedly stabbed. See, e.g., Finney v. State, 660 So.2d 674 (Fla. 1995); Pittman v. State, 646 So.2d 167 (Fla. 1994); Atwater v. State, 626 So.2d 1325 (Fla.1993).
In support of the HAC aggravator, the sentencing order of the trial court describes in detail the numerous wounds on Colvin's body and the fact that these wounds were likely caused by the forceful swinging of the samurai sword. The sentencing order notes that the testimony of Dr. Steiner and FDLE analyst Parker support the finding that Colvin *1160 was conscious and suffering intense pain during the attack. The sentencing order concludes as follows:
That the evidence in this case establishes that this murder was a conscienceless and pitiless crime which was unnecessarily torturous to the victim. The wounds were inflicted in a gruesome and hideous manner evincing extreme and outrageous depravity and exemplified by an utter indifference to the suffering of another and the desire to inflict a high degree of pain. The victim was alive and conscious and experienced fear, terror, pain, and foreknowledge of death.
The Court finds that the existence of this aggravating factor has been established beyond and to the exclusion of any reasonable doubt.
We reject Guzman's argument that Colvin's intoxication indicates that he was likely unconscious and thus incapable of experiencing terror or pain. This Court addressed this argument in a case with strikingly similar facts to those in Guzman's case. Whitton v. State, 649 So.2d 861 (Fla.1994). The victim in Whitton was beaten to death and had a blood alcohol level of .34 at the time of the attack. In upholding the trial court's finding of the HAC aggravating factor, this Court wrote, "The defensive wounds and blood trail also indicate that, although clearly intoxicated, [the victim] was aware of what was happening to him [and] ... he would have felt pain as a result of the injuries he sustained." Id. at 867. Thus, the fact that a victim was substantially intoxicated at the time of his or her death does not preclude a finding based on the evidence that he or she was conscious and experiencing pain.
We also reject Guzman's argument that the HAC aggravator should not apply because there is no evidence that Colvin was intentionally made to suffer. The intention of the killer to inflict pain on the victim is not a necessary element of the aggravator. As previously noted, the HAC aggravator may be applied to torturous murders where the killer was utterly indifferent to the suffering of another. See Kearse; Cheshire.
We find the HAC aggravating factor in this case to be clearly supported by the evidence. Colvin was hacked, cut, and stabbed a total of nineteen times. Colvin suffered eleven incised and hack-type wounds to his face and skull, four stab wounds to his back and neck, three stab wounds to his chest, and one defensive wound to his hand. The blows to Colvin's head were administered with such force that the skull was fractured and a bone fragment was separated from the head. Colvin's cause of death could not be attributed to any one wound, but resulted from a loss of blood attributable to all of the wounds. Furthermore, despite his intoxication, Colvin was conscious during at least part of the attack. The blood spatter evidence demonstrates that Colvin's head was raised off the bed during the assault. The defensive wound to his left hand indicates that he struggled to defend himself from his attacker. Moreover, Cronin and Rogers both testified that Guzman confessed that Colvin was conscious when the attack began. In sum, we agree with the trial court that the murder was a conscienceless and pitiless crime that was unnecessarily torturous to the victim. Accordingly, we find competent, substantial evidence to support the trial court's finding that the HAC aggravating factor was proven.
Guzman contends that the trial court erred in finding the avoiding-arrest aggravating factor. The trial court based its finding on several incriminating statements made by Guzman to Cronin. Guzman told Cronin that it would be easy to rob Colvin because he was drunk all the time and usually had money. Cronin further testified that Guzman stated to her that if he ever robbed anybody he would "have to kill them" and that "dead witnesses can't talk." We have found the avoiding-arrest aggravator in cases where the defendant's own statements demonstrate that the primary motive for the murder was the elimination of witnesses. See, e.g., Remeta v. State, 522 So.2d 825, 827 (Fla.1988)("Anytime I seen a witness, I took him out, or at least shot him."); Kokal v. State, 492 So.2d 1317, 1319 (Fla. 1986)("[D]ead men can't tell lies."); Pope v. State, 441 So.2d 1073, 1075 (Fla.1983)(defendant stated prior to murder that he intended *1161 to eliminate the victim as a witness). We find the evidence in this case sufficient to support the trial court's application of the avoiding-arrest aggravating factor.
In his next claim, Guzman argues that the trial court erred in finding the cold, calculated, and premeditated aggravating circumstance. Guzman essentially argues that the evidence does not demonstrate that the murder was committed with heightened premeditation. To support a finding of the CCP aggravator, the evidence must establish beyond a reasonable doubt that: (1) the murder was the product of cool and calm reflection; (2) there was a careful plan or prearranged design to commit murder before the fatal incident; (3) there was heightened premeditation; and (4) there was no pretense of moral or legal justification for the murder. Walls v. State, 641 So.2d 381 (Fla.1994).
In support of finding the CCP aggravator, the trial court noted:
Several days before this murder Defendant stated to Cronin "it would be easy to rob [Colvin] because he was drunk all of the time and usually had money." Defendant had engaged her in discussions of robbery in general and told her "if he ever robbed anybody he'd have to kill them"; so if he ever committed that crime he'd have to kill a person.
Defendant had for some time been calmly reflecting on killing and robbing Colvin. On the day of the murder, Defendant had been out drinking with Colvin and knew he was drunk. Defendant saw his opportunity and planned to kill and rob Colvin. He had taken Colvin back to his room and had kept Colvin's key ring. He showed the key ring to Cronin and told her he was going to help Colvin move. State Witness Rogers also testified Defendant told him he had kept the key to Colvin's room.
When Cronin returned to her room the Defendant was not there. He returned to the room carrying a small plastic garbage bag. He appeared upset. The contents of the bag appeared to Cronin to be white rags. He left the room and returned a few minutes later without the plastic bag. She asked him what was wrong. He said "I did it." She asked him what he meant by that. He responded "I killed [Colvin]."
Cronin testified Defendant later told her that [Colvin] was passed out and appeared to wake up. Defendant knocked Colvin out then stabbed him with a samurai sword.
That explanation by Defendant to Cronin is supported by the medical examiner's testimony that the initial wounds to the front of the body occurred earlier in the assault and the victim suffered a defensive wound to the left forefinger trying to ward off a blow. The body was then either rotated or moved to the face down position. This testimony indicates the victim was first stabbed as he lay on his back in the bed.
The State presented witness Paul Rogers who testified Defendant had confessed this murder to him while they were in jail. Rogers said Defendant told him he had driven Colvin to the bank and had gone drinking with him; that he had kept the key to Colvin's room when they returned. Rogers also testified that Defendant told him Colvin woke up when he was in the room; that he hit him with the samurai sword then stuck him 10-11 times; that he then cleaned up the sword, took a ring and cash, went to his room and cleaned up; then put everything in a bag and threw it in a dumpster.
Rogers version of Defendant's confession to him is strikingly similar to the confession Cronin testified Defendant made to her.
The sequence described by Rogers would explain why there was blood found in the inner right front pocket of decedent's tan pants as testified by State witness McNab.
These facts clearly establish that this was a cold, calculated and premeditated murder. The premeditation was heightened premeditation. There was no evidence to even suggest moral or legal justification.
The Court finds that the existence of this aggravating factor has been established beyond and to the exclusion of any reasonable doubt.
*1162 We must conclude that the evidence in the record does not support the trial judge's finding that the murder was cold, calculated, and premeditated. Witnesses Cronin and Rogers testified that Guzman stated that he was taking money from Colvin's motel room when his intoxicated victim awoke and began to sit up in bed. Guzman confessed that he used the samurai sword that was in the room to murder Colvin. Thus, the undisputed testimony of the only witnesses to the events immediately surrounding the murder reflect the view that the murder was neither calculated nor committed with heightened premeditation. Rather, the testimony reveals that the murder was an extemporaneous action intended to eliminate a potential witness to the theft.
In his final claim, Guzman argues that his death sentence is disproportionate. In his sentencing order, the trial judge found that five aggravating circumstances were proven beyond a reasonable doubt. Although we have determined that the CCP aggravating circumstance was not established, we find that the remaining four aggravators, arrayed against no statutory mitigation and little nonstatutory mitigation, amply support the imposition of the death sentence. We have upheld the death penalty in comparable cases. See, e.g., Jimenez v. State, 703 So.2d 437 (Fla.1997)(death sentence proportionate where four aggravating circumstances, including prior violent felony conviction, murder during the commission of a burglary, murder committed while under community control, and HAC, outweighed minimal statutory and nonstatutory mitigation), cert. denied, ___ U.S. ___, 118 S.Ct. 1806, 140 L.Ed.2d 945 (1998); Rolling v. State, 695 So.2d 278 (Fla.)(death sentence proportionate where trial court found that four aggravators, including HAC, prior violent felony conviction, murders during commission of burglary or sexual battery, and cold, calculated and premeditated outweighed two statutory mitigators and significant nonstatutory mitigation), cert. denied, ___ U.S. ___, 118 S.Ct. 448, 139 L.Ed.2d 383 (1997); Henyard v. State, 689 So.2d 239 (Fla.1996) (finding four aggravators, including HAC, prior violent felony conviction, and murder during commission of kidnapping and sexual battery outweighed two statutory mitigators and minor nonstatutory mitigation), cert. denied, ___ U.S. ___, 118 S.Ct. 130, 139 L.Ed.2d 80 (1997); Marshall v. State, 604 So.2d 799 (Fla.1992) (affirming death sentence where four aggravators, including HAC, prior violent felony convictions, and murder during commission of burglary outweighed minor mitigation).
For the reasons expressed, we affirm Guzman's convictions and his sentence of death.
It is so ordered.
OVERTON, SHAW, KOGAN, ANSTEAD and PARIENTE, JJ., concur.
HARDING, C.J., concurs with an opinion.
WELLS, J., concurs with an opinion.
HARDING, Chief Justice, concurring.
After reviewing the trial judge's order, I find there is insufficient justification for a finding of CCP on the face of the order. A statement in Hardy v. State, 23 Fla. L. Weekly S347, 716 So.2d 761 (Fla.1998), similar to the statement made by Guzman,[4] has been held insufficient to establish CCP.[5] Absent such a statement, the order is clearly insufficient to establish CCP.
WELLS, Justice, concurring.
I concur in the affirmance of the conviction and sentence and in the majority opinion in all respects except for the decision striking CCP as an aggravator. I believe that there is clearly competent, substantial evidence to support the trial court's finding of CCP and that the trial court applied the right rule of law. On that basis, the finding of an aggravator is to be affirmed. See Jimenez v. State, 703 So.2d 437, 441 (Fla.1997).
In Occhicone v. State, 570 So.2d 902, 905 (Fla.1990), in upholding a trial court's decision as to CCP, this Court said:

*1163 The totality of the circumstances relied upon by the trial judge support his finding the murder to have been committed in a cold, calculated, and premeditated manner with no pretense of moral or legal justification. When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court and, therefore, we affirm this finding.
I am very concerned that this sound view of this Court's role is increasingly being cast aside, and this Court's proper role of reviewer is being abandoned for the assumed role of sentencer.
NOTES
[1] The waiver was at the instance of Guzman himself and was contrary to the advice of his counsel. The record reveals that Guzman's waiver was knowing, voluntary, and intelligent. Questions were asked of Guzman in open court by both the trial judge and Guzman's counsel. Guzman also signed a written waiver of his right to a jury trial.
[2] Guzman contends that the trial judge erred by:

(1) improperly denying his motion for mistrial;
(2) convicting him in the absence of substantial and competent evidence of guilt; (3) failing to dismiss the case due to double jeopardy; (4) improperly ruling on "various issues"; (5) imposing a disproportionate death sentence; (6) improperly finding the "heinous, atrocious, or cruel" aggravating circumstance; (7) improperly finding the "avoiding arrest" aggravating circumstance; and (8) improperly finding the "cold, calculated and premeditated" aggravating circumstance.
[3] Issues one, three, and four are without merit.
[4] Guzman stated that "if he ever robbed anybody he'd have to kill them."
[5] Hardy v. State, 23 Fla. L. Weekly S347, 716 So.2d 761 (Fla.1998), was released after the sentence was imposed in Guzman's case.