929 So.2d 524 (2006)
Jermaine FOSTER, Appellant,
v.
STATE of Florida, Appellee.
No. SC03-1331.
Supreme Court of Florida.
March 23, 2006.
Rehearing Denied May 8, 2006.
*525 Frank J. Bankowitz, Orlando, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Jermaine Foster appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

FACTS
Foster was found guilty of first-degree murder and sentenced to death based on the following facts:
On the morning of November 28, 1993, Gerard Booker came to the trailer shared by Foster and Leondra Henderson and stated he wanted to recoup his recent gambling losses by committing robberies. The trio proceeded to Auburndale to a place called "The Hill." Armed with a .38 caliber handgun, a .9 millimeter handgun, and an Uzi-type automatic weapon, Foster and Booker, who were joined by Alf Catholic, approached three unknown men who were selling drugs from their truck. After forcing the victims to remove their clothing and lie on the ground, Foster, Catholic, and Booker stole the victims' cash, jewelry, crack cocaine, and red Ford pickup truck. Henderson then joined the group, and they concealed the stolen truck for future use.
Foster and Catholic returned to The Hill and sold some of the stolen drugs; *526 however, the proceeds of the robbery were not sufficient to cover Booker's gambling losses. The group of Foster, Catholic, Booker, and Henderson agreed to find a local drug dealer and rob him. Then they retrieved the stolen red truck and loaded the guns from the earlier robbery into it. When the group was unable to locate their intended victim, they drove to Osceola County to visit a girlfriend of Catholic and to find other victims to rob.
At the girlfriend's house, the group decided to accompany the girlfriend and some of her friends to the Palms Bar in St. Cloud. Catholic and Foster rode in the car driven by Catholic's girlfriend, and Henderson and Booker followed in the stolen red truck. Both drivers stopped their vehicles in route to the bar, and Catholic's girlfriend bought some liquor. Testimony revealed that Foster and Catholic drank liquor and smoked marijuana during the trip. Then the two drivers pulled over so the girlfriend could buy some gas. It was determined at that time that there were problems with the truck's fan belt, which had caused the truck to overheat and smoke during the trip. Booker stated that they would have to steal another car in which to return home that night.
Once at the Palms Bar, Foster and Catholic drank liquor, and Foster played a video game and danced. After a while, the group went outside, and Booker detailed a plan to rob the entire bar. Foster told Booker the plan was "crazy" because it was unknown what "those boys got in there." As the group headed back into the bar, Henderson noticed a black Nissan Pathfinder that was in the parking lot. Henderson determined that Anthony Faiella and Mike Rentas had come to the bar in that vehicle. In fact, Faiella and Rentas came to the bar to meet Anthony Clifton, who was with Tammy George. Henderson pointed out Faiella, Rentas, and Clifton to Booker as possible victims to rob of their money and their vehicle. The group decided upon a plan to follow the potential victims when they left the bar in the Pathfinder. Foster told Henderson, Booker, and Catholic that if the victims did not have any money, he was going to kill them.
At around 1:30 a.m., Faiella, Rentas, Clifton, and George left the bar in the Pathfinder. The other group followed them in the red truck. Catholic was driving the truck and rammed into the back of the Pathfinder to get that vehicle to stop. When the victims stopped and got out of the Pathfinder to inspect the damage, the group in the red truck took out their weapons and demanded money from the occupants of the Pathfinder. After the victims stated that they did not have any money, the victims were forced to return to the Pathfinder. Booker drove the Pathfinder, and Henderson held the victims at gun-point from the passenger seat. The others followed in the red truck.
On the outskirts of Kissimmee, the red truck again began experiencing mechanical problems. Catholic turned off the main highway and drove a short distance into a vacant field; Booker and the victims followed in the Pathfinder. All four of the victims were ordered out of the Pathfinder, and Tammy George was separated from the three male victims. The group again demanded money from the male victims. When these victims did not produce any, they were ordered to remove their clothes, and Foster had the men place their underwear and hands on their heads and lie face down on the ground.
At this point, Foster, from a position beside and to the rear of Anthony Clifton, *527 shot Clifton in the back of the head, killing him. Foster then approached Rentas and fired at his head. The bullet hit him in the hand, and Rentas pretended to be dead. Foster next walked to Faiella and shot him in the head, killing him. After this, Foster approached George as if to kill her, but Booker talked him out of it. The group then left in the Pathfinder and unsuccessfully tried to dispose of it by driving it into a lake. All four of the assailants were apprehended within days.
Foster v. State, 679 So.2d 747, 750-51 (Fla. 1996). The jury convicted Foster of two counts of first-degree murder, one count of attempted first-degree murder, and four counts of kidnapping, and further unanimously recommended that Foster be sentenced to death on each of the two first-degree murder convictions. Id. at 751. The trial court followed this unanimous recommendation and, in its sentencing order, found four statutory aggravators,[1] one statutory mitigator,[2] and numerous non-statutory mitigators. On appeal, Foster raised twelve issues.[3] This Court rejected all of the claims raised on appeal and affirmed the convictions of guilt and the sentences of death. Id.
Foster filed a "shell" motion for postconviction relief. He later amended the motion and raised the following claims: (1) Foster's trial counsel was ineffective for failing to adequately investigate and prepare for the case; (2) Foster's trial counsel was ineffective for not providing evidence relating to Foster's mental health to the jury; (3) Foster's trial was compromised by procedural and substantive errors; (4) Foster's trial counsel was ineffective for failing to object to the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner; (5) the jury received inadequate guidance from the court regarding the aggravators to be considered; (6) prejudicial pretrial publicity denied Foster's right to an impartial trial; (7) the penalty phase jury instructions unconstitutionally shifted the burden to Foster; and (8) Foster's counsel was ineffective because the court failed to instruct the jury regarding the statutory mitigator regarding the crime being committed while Foster was under extreme mental disturbance.
*528 On September 25, 2000, Foster filed a supplemental motion to vacate his judgment of conviction and sentence, asserting that he was denied effective assistance of counsel because counsel failed to investigate a voluntary intoxication defense in conjunction with his mental disability. On January 23, 2002, Foster filed a motion for leave to amend his motion to vacate, alleging that according to Janet Vogelsang, a social worker and penalty phase witness, when she met with defense counsel Smallwood, he once made a racial slur against the defendant and further stated that mitigation was useless. The postconviction court found that the evidence was not newly discovered and denied the motion to amend as untimely. The court held an evidentiary hearing, which began on January 30, 2002, and ended on February 1, 2002. Subsequently, the trial court denied Foster's rule 3.850 motion.
Foster appealed to this Court raising three issues: (1) whether trial counsel was ineffective for failing to raise and establish a voluntary intoxication defense in conjunction with evidence pertaining to Foster's mental disability; (2) whether the trial court erred by denying the Atkins and Ring claims[4] without an evidentiary hearing; and (3) whether the trial court erred by not permitting an amendment to the motion to vacate his judgment and sentence based upon the claim relating to Vogelsang's statement. After oral argument, we relinquished jurisdiction of the case to the postconviction court in order for the postconviction court to hold an evidentiary hearing on the allegations set forth in Foster's motion for leave to amend his motion to vacate. After the lower court held an evidentiary hearing and denied relief on this last claim, Foster filed a supplemental brief, contending that the court erred in failing to grant relief on this claim.

ANALYSIS

Ineffective Assistance of Counsel
In Foster's first claim, he asserts that the trial court erred in denying his postconviction motion due to his counsel's alleged ineffectiveness in failing to present a defense of voluntary intoxication in conjunction with Foster's mental disability. In order to establish a claim of ineffective assistance of counsel, Foster must meet the two-prong test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Id. at 687, 104 S.Ct. 2052. In reviewing a trial court's ruling on an ineffectiveness claim, "[t]he appellate court must defer to the trial court's findings on factual issues but must review the court's ultimate conclusions on the deficiency and prejudice prongs de novo." Bruno v. State, 807 So.2d 55, 62 (Fla.2001).
Specifically, Foster challenges whether his counsel presented sufficient evidence to *529 support a defense of voluntary intoxication and challenges trial counsel's decision in not presenting evidence regarding Foster's mental disability as it related to this defense. According to Foster, since specific intent was an element of the crime charged, his counsel could have presented more evidence that this intent was not established and should have presented evidence that Foster's voluntary intoxication, coupled with his diminished mental capacity, which bordered on mental retardation, prevented Foster from forming the specific intent required. In support of this claim, Foster relies on this Court's decision in Gurganus v. State, 451 So.2d 817, 822-23 (Fla.1984), where the Court held that "evidence of voluntary intoxication, or for that matter evidence of any condition relating to the accused's ability to form a specific intent, is relevant."
At the time of Foster's trial, Chestnut v. State, 538 So.2d 820 (Fla.1989), was the controlling law on this issue.[5] In Chestnut, this Court held that a defendant could not present evidence of an abnormal mental condition which did not constitute legal insanity for the purpose of proving that the defendant did not entertain the specific intent essential to prove the offense. Id. Moreover, the decision specifically dismissed the statement in Gurganus which stated that "`evidence of any condition relating to the accused's ability to perform a specific intent' is relevant," finding that this reference was merely "obiter dictum" because that issue was not before the Court. Id. at 822 (quoting Gurganus, 451 So.2d at 822-23). The opinion further clarified that Gurganus "simply reaffirmed the long-standing rule in Florida that evidence of voluntary intoxication is admissible in cases involving specific intent." Id.
At the evidentiary hearing, trial counsel testified that he acted under Chestnut.
Q Was it your understanding at that point in time that the law was still the Chestnut law, the state of the law in Florida was that diminished capacity defense was not allowable?
A Yes, sir.
Q And had you as a criminal practitioner made every attempt to keep up with that area of the law?
A Yes, sir.
Q And were you aware at that time of any  as far as you recollect anyway, of any cases up to that time you did the trial that changed that law?
A No, sir. That was that law we were acting under.
Although the law later changed in this area,[6] this Court has "consistently held that trial counsel cannot be held ineffective for failing to anticipate changes in the law." Cherry v. State, 781 So.2d 1040, 1053 (Fla.2000). The trial court determined that defense counsel was not ineffective in relying upon the Chestnut decision. We agree.
Next, we turn our attention to the related claim regarding counsel's alleged failure to present a defense of voluntary intoxication. In a detailed order denying *530 postconviction relief, the postconviction court outlined substantial, competent evidence as to why defense counsel took the approach he did in presenting the defense of voluntary intoxication. First, the court noted that counsel was aware of the defense of voluntary intoxication and that he presented the defense as best as he could with the limited amount of evidence that he had. Counsel informed the jury during opening statements that Foster had been smoking marijuana and drinking gin before the murders; he elicited testimony from State witnesses that supported these statements; he focused on Foster's lack of premeditation in closing arguments and specifically argued the defense of voluntary intoxication during rebuttal; and he requested a jury instruction on voluntary intoxication, an instruction which was given. However, as the postconviction court pointed out, counsel faced many obstacles in presenting such a defense.
Mr. Smallwood testified that Defendant herein could remember many details concerning the crime and seemed to be very clear about the circumstances. He also stated that Defendant articulated a reason for killing the victims. He also indicated that he questioned Defendant as to his drug and alcohol use on the day of the murders and that Defendant's response did not indicate that he had consumed large quantities of either. Mr. Smallwood indicated that he would have liked to contact the other people who were with Defendant on that day to confirm Defendant's narrative but that he could not question them because they were the co-defendants and they would not talk to him. Mr. Smallwood testified that Defendant appeared to understand what was going on and that he would assist his attorneys on occasion. At the evidentiary hearing, Mr. Smallwood was questioned as to whether he considered a voluntary intoxication defense and he responded that:
A If we had the factual basis to have done that and been successful in presenting it we would have been glad to hire Doctor Lipman. We felt like he had done a great job of us on Dusty's case [the prior capital case in which counsel was involved] and we had a good working relationship with him but the facts just weren't there for us to be able to do that.
Q Could you explain to the Court why you didn't think the facts were there?
A Several reasons. One, which was different in Dusty's case, there you had a long history of drug abuse, specifically marijuana. We had a lot of friends we had discovered that could come in and testify as to his drug use. We had military buddies that testified when he was in Vietnam and so forth and so forth, so we could lay out the predicate, to lay the factual basis for Doctor Lipman's testimony. In this particular case we didn't have that opportunity.
Jermaine was a young man. The best we had was what Jermaine had told us of what his past addiction had been both with drugs and alcohol. The factual basis we had for the day of the actual event wasn't enough to give rise that Doctor Lipman would have been able to help us establish a mitigator.
Q What was it about it that was lacking?
A Well, the best we could get out of Jermaine was that he remembered drinking some liquor after they had gone to the liquor store.

*531 Mr. Smallwood further testified that he had decided not to have Defendant testify himself concerning his drug and alcohol use that day because there was damaging information which the State would have been able to introduce via Defendant's testimony. Additionally, Mr. Smallwood stated that the State would have eviscerated Defendant's credibility because there was a police record in which Defendant and a co-defendant discussed telling police that they had been drinking at the time and to blame the crime on their drinking. Mr. Smallwood testified that he was able to present some evidence of voluntary intoxication via the other witnesses at trial....
....
Mr. Smallwood testified that mental health experts, including Dr. Henry Dee, a clinical neuropsychologist, were hired to examine Defendant, although it was for the penalty phase, and that neither of the experts suggested that he should pursue some sort of mental retardation defense. He also testified that he did not think there was a factual basis for a mental retardation claim. Mr. Smallwood knew that the law in Florida at the time of the trial did not allow a diminished capacity defense.
The postconviction court concluded that defense counsel made a "tactical decision to try to emphasize that the murders were not premeditated while also trying to give the jury some evidence of voluntary intoxication." We find no error in the postconviction court's conclusion that Foster failed to demonstrate that his counsel was ineffective.
Further, even if this defense could have been better presented, the postconviction court did not err in finding that Foster failed to demonstrate prejudice. As addressed above, trial counsel did present a voluntary intoxication defense to the jury. However, there was also substantial evidence presented to the jury which invalidated this defense, including the fact that Foster had a clear recollection of the details of the offense and that the offense involved deliberate behavior, i.e., forcing the victims to lie naked on the ground with their underwear on their heads and then shooting them one-by-one before deciding to spare one member of the group, who was a black female. The defense of voluntary intoxication was before the jury, and it was rejected. We find no error in the postconviction court's conclusions on this issue.

Ring Claim
In his second claim, Foster contends that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has consistently rejected this argument. See Parker v. State, 904 So.2d 370, 383 (Fla.2005); Bottoson v. Moore, 833 So.2d 693 (Fla. 2002); King v. Moore, 831 So.2d 143 (Fla. 2002). Moreover, we have recently held that Ring is not retroactive. See Johnson v. State, 904 So.2d 400, 409 (Fla.2005).

Atkins Claim
Foster also alleges that the postconviction court erred in summarily denying his claim that he is mentally retarded and thus the sentence of death violates Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Subsequent to Foster's postconviction evidentiary hearing that also included testimony concerning his mental abilities, the United States Supreme Court issued its decision in Atkins, which held that the imposition of the death penalty on those who are mentally retarded violates the Eighth Amendment. The Court further recognized *532 that to be considered mentally retarded, a defendant should be able to show: (1) a significantly subaverage intellectual function and that typically between 70 and 75 or lower is the cutoff IQ score; (2) related limitations in two or more of certain applicable adaptive skill areas; and (3) the onset must occur before age eighteen. Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242. Foster contends that the evidentiary hearing established all factors except whether the onset of his alleged mental retardation occurred before age eighteen; thus, he contends that the circuit court erred by denying his claim without an additional hearing that would provide him with an opportunity to establish this last element.
Contrary to such allegations, the lower court did not find that Foster established the necessary prongs to show mental retardation. First, after quoting extensive portions of Dr. Dee's testimony, the postconviction court found that Dr. Dee's testimony did not clearly establish that Foster was mentally retarded.
Q In your testing of Mr. Foster. . . did he have the mental functioning to do the every day chores from what you observed and the testing you did?
A He never had. No. And although there is some question in this case whether there was opportunity and whether or not he was a sufficient age at which  at least to me to make that determination, so I remember specifically saying while he was mildly retarded or borderline, that's about the best I could do in terms of descriptive functioning. I think from behavior, he could be considered mildly retarded, he didn't keep a job or kept any accounts, he always depended on other people for support. But, once again, there are socioeconomic factors have to be considered so I wasn't insisting on that.
....
On cross examination, however, Dr. Dee further clarified his opinion as to whether Defendant was mentally retarded. He testified that:
Q In looking at Mr. Foster's adaptive behavioral scales did you do like the Vineland test or any of the 
A No, I didn't think it would be particularly useful because I had the information I needed. I could do one now from the information I have but he never had a job for a substantial period of time. He hadn't finished school. He was not really functioning literal [sic]. He had a lot of cultural deprivation. It's a very difficult call in the situation. Still very young and he's been subject to some very bad influence, involved in criminal behavior and kind of moved around from pillar to post, and I was kind of reluctant to decide finally whether mental retardation for him so I said mildly retarded to borderline. Not borderline very high, but I was reluctant to make a decision regarding retardation.

(Emphasis added.) The postconviction court then reviewed the three prongs of mental retardation as noted in Atkins to determine whether Foster had proven any of the factors.
Dr. Dee testified that Defendant's IQ was 75, which at most is borderline to even begin to consider whether a person is mentally retarded. Nevertheless, even if Defendant's IQ score of 75 is considered as evidence of mental retardation, Defendant does not meet the second prong of the test set forth in Atkins, i.e., significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest *533 before age 18. Dr. Dee's testimony was refuted by the testimony of Leonore [sic] Henderson and by Mr. Smallwood, Defendant's original trial attorney....
....
Evidence showed that Defendant was supporting himself and functioning on his own, albeit, by illegal drug sales. He was even able to provide shelter and sustenance for another, Leondre [sic] Henderson. His communication skills, as evidenced by his meetings with his trial attorney and by his own testimony before this Court, did not indicate significant limitations as required by Atkins, 122 S.Ct. at 2242.
Moreover, the testimony from the original trial does not support the allegation that Defendant evidenced significant limitations in adaptive skills before age 18. In school, Defendant was not placed in special education classes nor was there any indication from teachers that Defendant was possibly mentally retarded.
It is evident that the issue as to whether Defendant is mentally retarded was presented at and explored during the evidentiary hearing in this matter. In Atkins, the Court stated that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 122 S.Ct. at 2250. After considering all the evidence and personally observing Defendant testify, this is just such an instance as contemplated by the United States Supreme Court. This Court finds that Defendant is not mentally retarded as defined in Atkins. The evidence simply does not support this claim.
After reviewing the record and the postconviction court's findings, we reject Foster's claim that his rights under Atkins were violated. Foster was afforded a hearing on the issue of mental retardation and was permitted to introduce expert testimony on the issue. The postconviction court found that the evidence did not support his claim. We find no errors in the postconviction court's findings or conclusions.[7]

Counsel Bias
In his final claim, Foster contends that the postconviction court erred in denying without an evidentiary hearing his claim that his counsel was racially biased. As addressed above, we relinquished jurisdiction on this claim for an evidentiary hearing relating to whether defense counsel made a racial slur. On January 20-21, 2005, the postconviction court held a supplemental evidentiary hearing. Defense counsel focused on the alleged racial slur and the related comment regarding mitigation and whether counsel failed to present or properly prepare for the mitigation phase. Defense counsel called Janet Vogelsang as the defendant's first and only witness. Vogelsang, a licensed clinical social worker from Greenville, South Carolina, was retained by Smallwood and Kelley in September of 1993 to provide a biopsychosocial assessment of Foster. According to Vogelsang, after she was retained, she sent the attorneys a checklist containing all of the information that she would need; she then talked to investigator Gary Phillips about the records and asked him to perform initial interviews on family members; and she flew to Florida to talk to family members in person. When she arrived, Phillips picked her up *534 at the airport and took her to an initial meeting at a local bar with Smallwood, the attorney who was responsible for the guilt phase. She could not recall when the racial comment was made or what was being discussed at the time, just that the comment was made pretty early in the case and that other people were present. While she could not recall the exact statement, Vogelsang asserted that Smallwood made a comment to the effect that "Jermaine is just another dumb nigger and who cares anyway about all this mitigation, the jury is not going to listen." However, Vogelsang did not document anything about the alleged racial slur, nor did she contact the judge about the slur because it was an isolated event. She did not see the comment as a pattern of racism but was more concerned about the dismissive attitude as to mitigation.
After her first visit to Florida to obtain information, Vogelsang wrote a letter to counsel stressing all of the items that she still needed, including the medical, school, criminal, psychological, and Health and Rehabilitative Services (HRS) records for all members of Foster's family up to and including his grandparents, aunts, and uncles. She never received most of the records as to other family members, did not receive the HRS records, and did not have the opportunity to interview Foster's teachers, neighbors, or the social workers. Based in part on the lack of records, Vogelsang did not believe that she had made a complete evaluation in the case. However, she did review a number of records, including Foster's medical records, school records, crime reports from the Federal Bureau of Investigation and the sheriff's office, arrest records, and numerous family records. She also saw records relating to Foster's mother, father, and stepfather. She reviewed portions of the transcripts from the federal trial and read depositions of one of the victims and a codefendant. Vogelsang interviewed a number of people, including Dr. Dee, Foster, his mother, two of his aunts, his father, his brother Tyree, two cousins, both of his grandmothers, and one of his grandfathers. She interviewed two HRS workers and learned the social workers were afraid to go to his neighborhood.
In order to prepare for trial, Vogelsang made a number of charts, which included information that she had been given during the interviews and reflected certain risk factors. The charts were never used, however, because the trial judge ruled that she could not testify as to what people told her in interviews. Instead, she simply testified that based on the accumulation of risk factors present in his life, Foster was at high risk and that he was a person whose judgment, insight, and decision-making skills were affected.
To rebut Vogelsang's testimony regarding the racial comment, the State called a number of character witnesses. Numerous judges in the community who had the opportunity to observe Smallwood represent clients of all different races testified that Smallwood zealously advocated for his clients regardless of their races. Witnesses who had known Smallwood since he was a child testified that they never observed any racial bias in Smallwood in the years they had known him. Each of the witnesses testified that Smallwood had a reputation in the community of being honest and trustworthy, and each was convinced that Smallwood was not racially prejudiced.
The State also called Nick Kelley, Gary Phillips, and Smallwood. Although Vogelsang asserted that she was sure somebody else was present when Smallwood made the racial comment, nobody else testified that such a statement was made. In fact, they strongly disagreed that Smallwood *535 would ever make such a comment. According to Kelley, other than the first meeting, he could not recall a time when Vogelsang was with Smallwood without Kelley being present, particularly since Smallwood was not responsible for the penalty phase. However, Kelley did testify that from the beginning of their appointment, he and Smallwood were concerned about whether race would be a factor in the case because this was a very high profile case where a group of young black men kidnapped a group of mostly Hispanic men and systematically shot all of the Hispanic men but released the one black girl who was also kidnapped. Race was still a concern when Vogelsang first arrived, and Kelley was sure that they had expressed this concern to Vogelsang.
The State also inquired into the amount of mitigation provided to Vogelsang. Kelley, Phillips, and Smallwood each testified that Vogelsang never expressed that she was dissatisfied with the information provided to her for her assessment. According to Phillips, the attorneys encouraged Phillips to find as much mitigation as possible. However, some of the records just did not exist or were not available. Phillips had a difficult time reaching certain people, and some witnesses did not want to be involved at all.
Kelley also testified regarding whether he prevented Vogelsang from testifying regarding her charts. According to Kelley, ten minutes before she was supposed to testify, Vogelsang brought in two charts and asked to testify at to those charts. Kelley told her that he had prepared his own chart with all the risk factors, and they would use that one.
Following the evidentiary hearing, the postconviction court entered a lengthy written order denying the claim. The judge first reviewed in detail the evidence presented by the character witnesses and concluded the following.
Over the defense's objection, this Court allowed the State to proceed with all of the [character] witnesses. However, it has limited consideration of their testimony, finding that their opinions regarding Mr. Smallwood and Mr. Kelley are relevant, but not dispositive of the issues raised in the Motion for Leave to Amend. What is abundantly clear is that every member of this group of mostly African-Americans is convinced that neither Mr. Smallwood nor Mr. Kelley has any racial bias whatsoever, and that both attorneys have demonstrated themselves to be zealous advocates for clients of all races. The Court finds no reason to conclude otherwise.
The court next concluded that Foster did not sufficiently prove that Smallwood made a racial slur.
If the alleged racial slur was made, and Ms. Vogelsang found it so troubling as to indicate the attorneys' failure to advocate zealously on behalf of a defendant who was facing the death penalty, logic dictates that she would have documented it and reported it immediately, as required by the ethical code of her profession. It is extremely significant that she did not do so. Instead, she allowed the trial to proceed, Mr. Foster to be convicted and sentenced to death, and the state supreme court to affirm his conviction. Altogether, she waited several years before filing her affidavit about the alleged racial slur, until she was contacted by collateral counsel during the investigatory stages of the postconviction proceedings. This Court concludes that the weight of the evidence presented at the evidentiary hearing leads to the conclusion that Mr. Smallwood did not make any racial slurs against Mr. Foster. Alternately, if the *536 comment was made, the Court finds that Ms. Vogelsang's interpretation of it was incorrect, because at most, it demonstrated the attorneys' concern for the manner in which a potential Osceola County jury would perceive Mr. Foster, given the racial tensions in Osceola County at the time and the publicity the case had generated. There is simply no support for the proposition that the statement reflected the manner in which the attorneys personally viewed him.
Finally, the court rejected Foster's allegation that he was denied due process based on his counsel's racial prejudice and the failure to provide mitigation materials.
Ms. Vogelsang testified that she provided defense attorneys Donald Smallwood and Nick Kelley with a checklist of records she needed to complete a biopsycho-social assessment and identify risk factors which can affect an individual's life, but they "refused" to provide her with all of the materials she needed. She contended that she wrote letters to the attorneys, expressing her concern about the need for additional records and suggesting there was much to be done.
Among the records she identified as missing were AFDC and HRS records, birth records of Mr. Foster's mother, and records pertaining to other specific individuals. In summary, she believed she was deprived of records which could have provided extensive details regarding Mr. Foster's family history and environment.
Attorneys Nick Kelley and Donald Smallwood, together with investigator Gary Phillips, each testified at the evidentiary hearing. All denied receiving any sort of checklist from Ms. Vogelsang, and all asserted that they made every effort to provide her with everything she requested during her meetings with them.
Mr. Kelley handled the penalty phase of the trial. He testified that when Ms. Vogelsang wrote the letter requesting additional materials, he directed Mr. Phillips to retrieve whatever he could, and the package was sent to her via Federal Express. He did not recall her expressing any dissatisfaction with anything he and Mr. Smallwood were doing, nor did he recall her complaining that she was not receiving the information she needed. He further testified that while Mr. Foster's family members cooperated during the investigative interviews, they did not want to testify at trial, and that he was "terrified" to subpoena them and put them on the stand if they did not want to be there. Ms. Vogelsang wanted to testify about her conversations with them, but the trial judge sustained the State's objection to this. Nevertheless, Ms. Vogelsang was allowed to testify, without objection, to the risk factors she believed were present in Mr. Foster's life, and Mr. Kelley believed she was an effective witness as the trial judge did find mitigation based in part on her testimony.
Mr. Phillips testified that both attorneys understood the true value of mitigation and never refused to provide Ms. Vogelsang with any of the items she requested. Some of the records, quite simply, did not exist, in part because social workers were often afraid to go to the part of town where Mr. Foster and his family lived.
Mr. Smallwood testified that he did not talk directly with Ms. Vogelsang about the records she needed, as Mr. Kelley was directing the penalty phase of the case. However, from the beginning, he believed that significant mitigating factors existed. He noted that Mr. Foster was young and, in his opinion, *537 involved with others who dominated him. When they met at the jail, Mr. Foster was crying and remorseful, and he was determined to do everything he could to spare Mr. Foster from the death penalty. He believed that Mr. Kelley and Mr. Phillips followed up on each potential mitigating factor, and provided all the information they could locate to Ms. Vogelsang.
Returning to the issue of Ms. Vogelsang's personally prepared visual aids, Mr. Kelley testified that he told her he preferred to use his own chart, which he had created after meeting with her to discuss the risk factors. In addition, he was concerned that her chart contained hearsay information which would not have been admissible at trial, although he acknowledged he might not have explained this to her. He wanted her testimony to stand before the jury without objection, which it did until attorney Chris Smith (who represented co-defendant Alf Catholic) tried to use her testimony in his case. During that examination, Ms. Vogelsang offered specific details, to which the State objected, and the jury was told to disregard her remarks, exactly the scenario Mr. Kelley had wished to avoid.
In summary, this Court finds no support for the proposition that Mr. Foster's attorneys refused to provide Ms. Vogelsang with records she requested, which were within their power to obtain, or for the proposition that they sabotaged her testimony in any way with respect to her visual aids.
Foster contends that the postconviction court erred in its conclusions and requests that this Court keep in mind that Vogelsang had nothing to gain by making such a statement if it were not true. However, such arguments would require this Court to second-guess credibility decisions that are rightfully in the hands of the trial court. As this Court has repeatedly held, "the trial court has `the superior vantage point to see and hear the witnesses and judge their credibility.' . . . `[S]o long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence.'" Peterka v. State, 890 So.2d 219, 232 (Fla.2004) (quoting Guzman v. State, 721 So.2d 1155, 1159 (Fla.1998), and Porter v. State, 788 So.2d 917, 923 (Fla. 2001), respectively), cert. denied, ___ U.S. ___, 125 S.Ct. 2911, 162 L.Ed.2d 301 (2005). In turning to the case presented, there is competent, substantial evidence to support the postconviction court's factual findings, including the findings relating to the witnesses' credibility. Foster has also failed to show that the court erred relative to its legal conclusions. Accordingly, we deny this claim.

CONCLUSION
For the foregoing reasons, we affirm the circuit court's denial of Foster's rule 3.850 motion.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects with the exception of its affirming the denial of an evidentiary hearing on Foster's Atkins claim. In Atkins, the United States Supreme Court held that states cannot execute a defendant who is mentally retarded. In rejecting Foster's *538 claim that he is entitled to an opportunity to prove a claim under Atkins, the majority relies on the fact that Foster's retardation was considered in a prior hearing. However, as explained below, it is apparent that Foster's prior evidentiary hearing was wholly inadequate to treat the issue as presented in Atkins. Therefore, we should relinquish jurisdiction to the circuit court for a determination of mental retardation pursuant to Florida Rule of Criminal Procedure 3.203.

ANALYSIS
Prior to the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the Florida Legislature created section 921.137, Florida Statutes (2001), which prohibited the execution of the mentally retarded. This law became effective on June 12, 2001. See Ch.2001-202, § 2, at 1833, Laws of Fla. However, by its express terms, this law did not apply to a defendant, such as Foster, sentenced to death prior to the effective date of the law. See § 921.137(8). Hence, Foster was not eligible for relief under this statutory scheme. However, in Atkins, the Supreme Court held that the execution of the mentally retarded constitutes excessive punishment under the Eighth Amendment of the United States Constitution, a ruling clearly applicable to Foster and other inmates similarly situated. See Atkins, 536 U.S. at 321, 122 S.Ct. 2242. Further, in response to Atkins, this Court adopted rule 3.203, which established three requirements to prove mental retardation and an entitlement to relief under Atkins: (1) subaverage general intellectual functioning, (2) deficits in adaptive behavior, and (3) manifestation before age eighteen. See Fla. R.Crim. P. 3.203(b). Rule 3.203 became effective on October 1, 2004.[8]
As is evident from the claims raised by Foster in the postconviction proceedings now under review, mental retardation was not one of the nine claims that Foster alleged.[9] Furthermore, both his postconviction *539 motion and the postconviction evidentiary hearing in January 2002 preceded the Supreme Court's decision in Atkins and this Court's enactment of rule 3.203. As a result, Foster could not have brought his mental retardation claim until after the evidentiary hearing occurred because Atkins had not yet been decided, and because section 921.137 did not apply retroactively. Further, it is clear that the January 2002 evidentiary hearing was focused on the claims raised in Foster's petition and did not adequately address the requirements of establishing mental retardation under Atkins or rule 3.203.
However, from the limited evidence presented at the prior evidentiary hearing concerning Foster's claim that his counsel was ineffective in his investigation and preparation of evidence of mental health mitigation, it is also apparent that Foster has a viable basis for his current Atkins claim as we have defined that claim in rule 3.203. Dr. Henry Dee testified that Foster had an IQ of 75 and was "mildly retarded or borderline." Dr. Dee also concluded that Foster never had the mental functioning to do everyday work and was always dependent on others. However, there was also testimony presented at the evidentiary hearing that Foster provided for himself, albeit by illegal drug sales. Further, there was testimony that Foster provided shelter for another, Leondre Henderson. There was also testimony from Foster's trial attorney, Don Smallwood, at the evidentiary hearing suggesting that Foster "was fully aware of what was going on" when he consulted with his client. The evidence presented at the evidentiary hearing is unclear as to whether Foster could establish the third factor of rule 3.203, manifestation prior to age eighteen. According to the original trial penalty phase transcript, there were no notations in the records from any teachers indicating any suspicion that Foster was mentally disabled, retarded, or needed special learning. However, there was evidence from school records that Foster was disruptive and disrespectful to his teachers.[10] As a result, none of these issues were adequately addressed at the postconviction evidentiary hearing because no Atkins or rule 3.203 claim was pending. The evidence described above was presented on Foster's claim that his counsel was ineffective in preparing a case for mental health mitigation.
Although rule 3.203(d)(4)(E) explicitly requires that a motion for an evidentiary hearing must be filed within sixty days of October 1, 2004, we have previously treated a mental retardation claim made in an appeal of a trial court's denial of postconviction relief and in a direct appeal of a death sentence to be an invocation of rule 3.203.[11]See Johnston v. State, No. SC03-824 *540 (order filed Dec. 17, 2004) (relinquishing jurisdiction to the circuit court for a determination of mental retardation pursuant to rule 3.203 in response to a claim made in the defendant's appeal of a trial court's denial of postconviction relief); Thomas v. State, 894 So.2d 126, 137 (Fla. 2004) (relinquishing jurisdiction to the circuit court for a determination of mental retardation in response to a claim made in the defendant's direct appeal of a death sentence), cert. denied, 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005). Here, as was the case in Johnston and Thomas, rule 3.203 took effect after this case was on appeal, and after oral arguments were heard by this Court. We should treat Foster's assertions on appeal relating to Atkins and mental retardation as an invocation of rule 3.203,[12] as we did in Johnston and Thomas, and direct that a proper hearing be conducted during which Foster's Atkins claim can be fully explored and adjudicated as we contemplated by the enactment of rule 3.203.

CONCLUSION
The majority overlooks the critical distinction between the presentation of evidence of mental retardation as a mitigator or incidental to a claim of ineffectiveness of counsel, and the very different presentation of a claim of mental retardation as a bar to execution as established in Atkins and by our 2004 rule. While it is true that Foster had an opportunity to present mental health evidence as a nonstatutory mitigator at his trial and as related to the issue of his counsel's ineffectiveness at the subsequent postconviction evidentiary hearing, at no time did Foster allege or attempt to prove mental retardation as a constitutional bar to execution under section 921.137, Atkins, or rule 3.203. Furthermore, even from the limited evidence presented at the evidentiary hearing on his ineffectiveness claim, Foster appears to have a colorable Atkins claim.
Because of the obvious importance of this issue, we should not summarily resolve it on the basis of the evidence of mitigation presented at an earlier stage of the case. Rather, we should allow Foster an opportunity to demonstrate that the constitutional bar forbidding the execution of the mentally retarded applies to him in a proceeding specifically focused on this claim as provided for in Atkins and our rule.
NOTES
[1] The trial court found: (1) Foster was previously convicted of another capital felony; (2) the capital felony was committed while the defendant was engaged in the commission of a kidnapping; (3) the capital felony was committed for pecuniary gain; and (4) the capital felony was committed in a cold, calculated, and premeditated manner.
[2] The trial court found that Foster's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
[3] Foster's claims were: (1) the death penalty is disproportionate; (2) the trial court improperly balanced the aggravators against the mitigators; (3) the trial court erred in denying Foster's motion for mistrial based on the wrongful admission of hearsay evidence over defense objection; (4) the trial court erred by allowing witnesses to testify about other crimes or bad acts; (5) the trial court erred in excusing a juror for cause over defense objection; (6) the trial court erred in instructing the jury that it could consider whether the murder was heinous, atrocious, or cruel; (7) the trial court erred in refusing to strike jurors for cause; (8) the trial court erred in finding that the murders were committed in a cold, calculated, and premeditated manner; (9) the trial court erred in overruling objections to the introduction of racial prejudice into the proceedings; (10) the trial court erred in considering separately that the murder was for pecuniary gain and that the murder occurred during the course of a kidnapping; (11) a new trial is warranted because of prosecutorial misconduct; and (12) section 921.141, Florida Statutes (1993), is unconstitutional.
[4] Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[5] Postconviction counsel does recognize that Chestnut was the prevailing law at that time but asserts that the Chestnut Court was obviously divided and that the dissent was the more well-reasoned argument based on the Court's later decision in State v. Bias, 653 So.2d 380 (Fla.1995).
[6] After Foster's trial, this Court issued its decision in State v. Bias, 653 So.2d 380 (Fla. 1995), which held that where a defendant raises the defense of voluntary intoxication and further has a mental defect, the trial court cannot exclude expert testimony about the combined effect of the mental disease and the intoxicants consumed on the defendant's ability to form a specific intent.
[7] We further note that while this case has been pending before this Court, Foster could have but did not request an evidentiary hearing pursuant to Florida Rule of Criminal Procedure 3.203.
[8] At the time of Foster's trial in 1994, mental retardation was not a bar to execution. However, during the penalty proceedings, Foster urged the trial court to find several nonstatutory mitigators including the fact that he came from an abused background, was mentally retarded, had a deprived childhood and poor upbringing, had organic brain damage, was an alcoholic, and was under the influence of alcohol at the time of the homicide. Based upon the mitigation evidence submitted by Foster, the trial court determined that Foster suffered from some organic brain damage, suffered an abusive childhood, was mildly mentally retarded, had a low IQ, suffered from a substance abuse problem, and was to some extent under the influence of drugs and alcohol during the murders. Further, the trial court found as a statutory mitigator that Foster's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired.
[9] Foster's amended motion for postconviction relief raised the following claims: (1) Foster's trial counsel was ineffective for failing to adequately investigate and prepare for the case; (2) Foster's trial counsel was ineffective for not providing evidence relating to Foster's mental health to the jury; (3) Foster's trial was compromised by procedural and substantive errors; (4) Foster's trial counsel was ineffective for failing to object to the trial court's finding that the murders were committed in a cold, calculated, and premeditated manner; (5) the jury received inadequate guidance from the court regarding the aggravators to be considered; (6) prejudicial pretrial publicity denied Foster's right to an impartial trial; (7) the penalty phase jury instructions unconstitutionally shifted the burden to Foster; and (8) Foster's counsel was ineffective because the court failed to instruct the jury on the statutory mitigator regarding the crime being committed while Foster was under extreme mental disturbance. Foster also filed a supplemental motion to vacate his judgment of conviction and sentence, asserting that he was denied effective assistance of counsel because counsel failed to investigate a voluntary intoxication defense in conjunction with his mental disability.
[10] The only mention of the third prong at the evidentiary hearing appears to be when Dr. Dee was questioned about mental disability on cross-examination by the prosecutor, Mr. Chris Lerner:

Q. I believe you just testified it consists of two components, actually three but let's forget about on set before age 18, let's assume that applies. In this case, then, would you have to look at the score on the IQ and the adaptive behavioral skills?
A. Yes. We did have addition of school records, which helps.
Q. The special ed would be more directed toward intellectual functioning would it not?
A. Yes, that's the way you classify for special ed, depends on the school item, but special ed is for kids slow in everything, not specifically a learning disability, it would be 75 or 70 or below at the, the rate you qualify for that.
[11] Rule 3.203(d)(4)(E) provides:

If a death sentenced prisoner has filed a motion for postconviction relief and that motion has been ruled on by the circuit court and an appeal is pending on or before October 1, 2004, the prisoner may file a motion in the supreme court to relinquish jurisdiction to the circuit court for a determination of mental retardation within 60 days from October 1, 2004. The motion to relinquish jurisdiction shall contain a copy of the motion to establish mental retardation as a bar to execution, which shall be raised as a successive rule 3.851 motion, and shall contain a certificate by appellate counsel that the motion is made in good faith and on reasonable grounds to believe that the defendant is mentally retarded.
[12] This Court previously relinquished jurisdiction to the postconviction court in order for the court to hold an evidentiary hearing regarding Foster's motion for leave to amend his motion to vacate. In this motion, Foster alleged that his trial attorney, Donald Smallwood, made statements that showed his bias and prejudice against black people and that those statements denied him due process, in that his own attorney presumed him guilty because of his race, and therefore did not adequately represent him. The trial court held an evidentiary hearing on January 20-21, 2005, and issued an order on March 1, 2005, denying the claim.