# Supreme Court of Florida

_____

No. SC18-806
_____

**ANGEL SANTIAGO-GONZALEZ,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 25, 2020

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. The appellant, Angel Santiago-Gonzalez, pleaded guilty in 2016 to the first-degree murder of Donald Burns. At the time of the 2014 attack that resulted in Burns' death, both men were inmates at the Reception and Medical Center (RMC), a Florida Department of Corrections facility located in Union County. Following a non-jury penalty phase proceeding, Santiago-Gonzalez was sentenced to death. For the reasons explained below, we affirm Santiago-Gonzalez's conviction and sentence of death.

## FACTS AND PROCEDURAL BACKGROUND

### The Incident and Response

Around 9:40 p.m. on the night of January 9, 2014, corrections officers responded to a disturbance in the K dormitory at the RMC. Captain William Hamilton was the shift commander that evening, and he had just completed his normal rounds, including the K dormitory, without incident. However, after finishing his rounds, Captain Hamilton heard a banging noise while talking with another officer, Sergeant Kelvin Young. Hamilton instructed Sergeant Young to investigate the source of the noise and to advise if he needed help.

The source of the banging noise was inmates who were trying to get the attention of the corrections officers and direct them to the cell where Burns and Santiago-Gonzalez were housed. When Sergeant Young reached the cell, Santiago-Gonzalez was standing inside the cell, and Burns, the victim of a brutal stabbing, was lying on the floor. Burns was also tied up, his hands and his feet both bound. Sergeant Young, who remained outside of the cell, advised via radio that he needed help. Captain Hamilton went to the cell, called for assistance from additional staff members, and notified the on-site medical personnel.

Santiago-Gonzalez had a knife in his hand that he refused to relinquish to the corrections officers until a video camera was brought to the cell to record him. A video camera was brought to the cell, and once the recording began, Santiago-

Gonzalez slid the knife under the cell door.  He was restrained without incident. While being escorted to a holding cell, Santiago-Gonzalez commented that he was not interested in homosexual activity.  A medical assessment of Santiago-Gonzalez conducted shortly thereafter confirmed that he was uninjured.

In Burns' cell, ligature cutters were used to remove the restraints that Santiago-Gonzalez placed on him.  Lieutenant Mark Ficken, who also heard the radio calls, responded to the cell to provide assistance and brought a camera to photograph the scene.  Lieutenant Ficken observed Burns' multiple stab wounds, including a severe neck wound, and believed them to be life-threatening.

Burns was weak but communicative, and he repeatedly said that he was afraid he was going to die.  Lieutenant Ficken then questioned Burns about the incident as follows:

> FICKEN: Listen to me, listen to me.  I need to know what happened
> in there.
>
> BURNS: I got stabbed multiple times.
>
> FICKEN: By who?
>
> BURNS: My roommate.
>
> FICKEN: What happened?  Why did he stab you?
>
> BURNS: I don't know.
>
> FICKEN: How did he tie you up?
>
> BURNS: I let him.

FICKEN: Huh?

BURNS: I let him.

FICKEN: You let him tie you up.  Why?

BURNS: I don't know.

FICKEN: Talk to me man, I need to know what happened in there.

BURNS: Tied me up.

FICKEN: He tied—

BURNS: He tried to rape me.

FICKEN: Huh?

BURNS: He tried to rape me.

FICKEN: You let him tie you up?

BURNS: No.

FICKEN: You just said you let him tie you up, why did you let him?

BURNS: I don't know.  I'm dying.

FICKEN: Huh?

BURNS: I'm going to die.

FICKEN: They are going to work on you, man, you need to tell me what happened.

BURNS: I guess (Unintelligible)

FICKEN: Why did you let him tie you up?

BURNS: I don't know.  I was a fool.

FICKEN: Huh?

BURNS: I was a fool.

FICKEN: Were you all playing games?

BURNS: No, sir.

FICKEN: Well, then how did you let him tie you up?

BURNS: I just did.

FICKEN: What's your roommate's name?

BURNS: Santiago.

FICKEN: You all have a beef?

BURNS: No, sir. He did it out of spite.

FICKEN: Huh?

BURNS: He did it out of spite.

FICKEN: Out of spite. Did he tie you up before he stabbed you?

BURNS: No, he tied me up and then stabbed me.

FICKEN: He tied you up and then stabbed you, huh?

BURNS: Yes, sir.

FICKEN: All right. So what I need to know though is how did he tie you up? Did he hold you down?

BURNS: Yes.

FICKEN: Or did you let him do it?

BURNS: He held me down.

FICKEN: Look, man, I need you to be truthful for me.

BURNS: I am.

FICKEN: He held you down and then he tied you?

BURNS: Yes.

FICKEN: Hey, listening to me?  What is your name, man?

BURNS: Burns.

**Santiago-Gonzalez Interview**

About three hours after the incident, senior inspector Kevin Ortiz conducted an interview of Santiago-Gonzalez.  After being advised of his *Miranda* rights, Santiago-Gonzalez advised that he understood his rights and wanted to discuss the incident.  Santiago-Gonzalez explained that hours before the incident, he asked a corrections officer to move him into Burns' cell to facilitate Burns helping him with his legal matters.  He said that he knew Burns was in prison for committing sexual offenses against minors but that he was not concerned because he just wanted legal help from Burns.[1]  According to Santiago-Gonzalez, after being in Burns' cell for two to three hours, Burns started "acting funny," and Santiago-Gonzalez started cleaning the cell.  At some point, Burns touched Santiago-

_____

1.  During senior inspector Ortiz's investigation, he learned that Burns and Santiago-Gonzalez were previously inmates at the Santa Rosa Correctional Institution, and the inmates there were aware that Burns was in prison for child molestation.

- 6 -

Gonzalez's buttocks underneath his boxer shorts, and Santiago-Gonzalez observed that Burns' penis was erect. Santiago-Gonzalez became irate.

Over the course of several minutes, Santiago-Gonzalez formed his plan to attack Burns and ripped his bedsheet into multiple pieces. He said:

> And I just, I wasn't, like, what the fuck, you know what I mean? And I said, I'm going to kill this man. I just blamed him. I wanted to tie him, I want to knock him over. I tied him up and I'm going to kill him and that's what I did. Just punch him somewhere in the eyes, somewhere in the head.

After Santiago-Gonzalez punched Burns in the head causing Burns to fall down, he tied Burns up with the torn pieces of bedsheet. One piece of the sheet was used to tie Burns' hands together, another to tie his feet together, and another to tie his bound hands and bound feet together. Then, Santiago-Gonzalez removed a concealed homemade knife from inside a bandage that was tied to his leg. He recalled:

> He [Burns] trying, he was, I just hold him down just to keep him, I punched around, all around the neck and head. I tried to stab him in the face, in the eye, heart, chest, back, and hand. I just black out, I just, I had been on psyche [sic] medication for a long time, just all my anger, everything, I just come out. I just black out. To be honest with you, I just, I don't know I just—

When questioned about his statement that he blacked out, Santiago-Gonzalez responded: "Really, I react slow. You know what I mean? I take my time and because I would like, what the fuck, and so now the mother fucker has to

die, he's going to die. I just plain knocked him out and tie him up, and that's what I did."

## Burns' Medical Treatment

Burns was initially treated for multiple stab wounds in the emergency unit at RMC. Nurse Jeffrey Dukes, who helped treat Burns, observed Burns' life-threatening wounds. Burns told Dukes that he was going to die. Due to the nature of his injuries, Burns was transported by EMS to the University of Florida Shands Hospital (Shands).

Trauma surgeon Dr. Lawrence Lottenberg treated Burns upon his January 10, 2014, transfer to Shands. Dr. Lottenberg recalled that Burns' case was memorable because of the numerous "stab wounds all over his neck, chest, and abdomen. Succumbed numerous times in the emergency department and in the operating room and yet managed to live through all of that." Dr. Lottenberg further stated: "Well, obviously this patient had wounds in his neck, both sides of his chest, in his abdomen. He had all of the stab wounds in his back. This patient was at an extreme level of pain and discomfort and required all of the aggressive support with pain medicine that we could give him."

**Burns' Death and Autopsy**

Burns lived for nearly six months after the stabbing and died on July 3, 2014. Dr. William Hamilton, the District Eight Medical Examiner, conducted the autopsy of Burns.

Dr. Hamilton identified a total of sixty-four stab wounds on Burns' body but conceded that number to be a minimum, not a maximum, because some wounds may have healed during the time between the stabbing and Burns' death. One of the multiple wounds was a gaping 9.5 inch x 2.5 inch healing abdominal wound.

Weighing only 86 pounds at the time of his death, Burns suffered from severe malnutrition as a result of the stab wounds, which Dr. Hamilton described as "penetrating injuries of chest and abdomen which resulted in a profound loss of blood and ischemic injury to internal organs, particularly to the intestinal canal." Dr. Hamilton also testified that Burns "had penetrating injuries into the central nervous system with a resultant small stroke in the cerebellum and subsequent infarction and necrosis of much of his spinal cord which left him quadriplegic." Dr. Hamilton did not identify any defensive wounds.

In November 2014, Santiago-Gonzalez was indicted for first-degree murder. He subsequently expressed his intent to plead guilty as charged, and in June 2016, the trial court sua sponte ordered two competency evaluations. Both experts

determined that Santiago-Gonzalez was competent to proceed and submitted written reports to that effect.

**The Guilty Plea**

On August 15, 2016, Santiago-Gonzalez pleaded guilty to first-degree murder. The trial court accepted the plea pursuant to the following plea colloquy:

> COURT: Is it your intent that you wish to plead guilty or no contest to this offense?
>
> DEFENDANT: Guilty.
>
> COURT: And is that because you're guilty of the offense, sir?
>
> DEFENDANT: Yes.
>
> COURT: Now, the attorneys can correct me if I'm wrong, but I believe there's only one count of first-degree murder. You understand that that offense carries a maximum sentence punishable by death, with the minimum sentence being life in prison without parole.
>
> DEFENDANT: Yes.
>
> COURT: You understand in Florida that "life" means life.
>
> DEFENDANT: Yes.
>
> COURT: Do you understand that the law means that you will not be eligible for parole or early release?
>
> DEFENDANT: Yes.
>
> COURT: Has anyone suggested to you that you will someday be released from prison if you enter a plea to this charge?
>
> DEFENDANT: No.

COURT: Do you understand that, for a case in which the State is seeking death, there's two phases?

DEFENDANT: Yes.

COURT: And do you understand that, if you enter a guilty plea here today, that will take care of the first phase?

DEFENDANT: Yes.

COURT: Do you understand the second phase requires either a trial by myself or a trial with a jury?

DEFENDANT: Yes.

COURT: And do you understand that you have a right to a jury trial for the second phase, also known as the penalty phase?

DEFENDANT: Yes.

COURT: And my understanding is today you wish to have the trial only before myself for the penalty phase.

DEFENDANT: Yes.

COURT: You understand that, if you change your mind as to phase two, you need to let your attorney know that you now request to have a jury trial as to the penalty phase.

DEFENDANT: Yes.

COURT: The last time you were in court you told me you wanted to plead guilty, and you wanted the death penalty; is that correct?

DEFENDANT: Yes.

COURT: You understand that at the penalty phase, the State would still have to put on evidence of the aggravators, and you understand I would consider any evidence of mitigators.

DEFENDANT: Yes.

COURT: That even if you maintain that you wish to seek the death penalty, after hearing all the evidence, I still may come back with a life sentence.

DEFENDANT: Yes.

COURT: Knowing that, do you still wish to go forward with this guilty plea?

DEFENDANT: Yes.

COURT: You also understand, at the penalty phase, that you may end up testifying under oath about the offense and that any answers that you may give could be used against you at a later date.

DEFENDANT: Yes.

COURT: Did your attorney go over with you what's known as the Jimmy Ryce warnings regarding there being a sexually violent or sexually motivated crime in your history?

DEFENDANT: I don't have any sexual charges.

COURT: I just wanted to make sure you're aware that, if you did, that you could be subject to involuntary civil commitment as a sexual predator.

DEFENDANT: I understand.

COURT: So, Mr. Santiago, you've had the services of the public defender's office, which you've had Mr. Chipperfield, Mr. Goldman, and Mr. Eisenmenger; is that correct?

DEFENDANT: Yes.

COURT: Have you been satisfied with their services?

DEFENDANT: Yes.

COURT: Is there anything you asked your attorney to do in this case that he refused to do?

DEFENDANT: No.

COURT: Do you feel that your attorneys have represented you to the best of their ability?

DEFENDANT: Yes.

COURT: Do you desire any additional time at this point to discuss anything that I've spoken with you about the case so far with your attorney?

DEFENDANT: No.

COURT: Your attorney mentioned to you that you have some pending motions outstanding. One involves a potential speedy trial issue that, if you were to win, would be dispositive, and the charges would be dismissed against you.

DEFENDANT: Yes.

COURT: You understand there's also some additional motions regarding the death penalty that are outstanding.

DEFENDANT: Yes.

COURT: You understand, by entering your plea of guilty prior to them being heard, you're going to waive your right to be able to appeal any order that I would give on those motions.

DEFENDANT: Yes.

COURT: Do you understand that if, in the future, a higher court finds the Florida death penalty statutes are unconstitutional, you would not be allowed to withdraw your plea based on that fact.

DEFENDANT: Yes.

COURT: You understand that by entering a plea that has a potential of a life sentence with no eligibility of parole —

DEFENDANT: Yes.

COURT: — you are forever waiving any future claim to withdraw your plea in the event that the United States or the State of Florida declared the death penalty unconstitutional.

DEFENDANT: Yes.

COURT: Do you understand that?

DEFENDANT: Yes.

COURT: Are you entering this plea freely and voluntarily?

DEFENDANT: Yes.

COURT: Has anyone forced or pressured you into entering this plea?

DEFENDANT: No.

COURT: Has anyone threatened you to get you to enter this plea?

DEFENDANT: No.

COURT: Are you currently under the influence of any alcohol?

DEFENDANT: No.

COURT: Has anyone promised you anything other than what we have discussed which has made you enter this plea today?

DEFENDANT: No.

COURT: With everything we've discussed up to this point, do you still wish to enter this plea?

DEFENDANT: Yes.

Defense counsel and the prosecutor then agreed to enter the competency

evaluation reports into evidence. The defense advised that it sought no further

testimony on the issue of competency. The Court continued:

> All right, Mr. Santiago. The Court finds that there is a factual
> basis for the plea and that Mr. Santiago has had an opportunity to
> consult with an attorney, of whom he says he's satisfied with, that he
> is alert and completely cognizant as to what is occurring in court
> today. The Court also finds the defendant is aware of all the rights he
> is waiving by entering his guilty plea today. In addition, the Court
> finds his pleas are freely and voluntarily made, and he understands the
> consequences of his pleas. The Court also finds he is competent to
> enter a plea to the charge. I, therefore, accept your plea of guilty to
> the one count of first-degree murder. So next we have to schedule the
> penalty phase. I'm also going to order a presentence investigation
> report.

**The Penalty Phase**

In February 2018, the trial court conducted a penalty phase in conjunction

with the *Spencer* hearing.[2] During the penalty phase, the State sought to prove the

existence of four aggravating factors, and the defense offered evidence in support

of fifty-seven mitigating circumstances.

*State's Initial Penalty Phase Case*

In addition to the evidence relating to the stabbing incident and subsequent

events that included Burns' death, the State also introduced evidence of Santiago-

Gonzalez's prior violent felony convictions. At the time of the stabbing, Santiago-

---

2. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

Gonzalez was serving nine life sentences plus an additional 215 years' imprisonment for multiple crimes, including attempted felony murder, kidnapping, armed robbery, robbery, battery on a person over the age of 65, false imprisonment, aggravated assault, and resisting arrest with violence.

*Defense Penalty Phase Case*

In mitigation, the defense presented evidence about Santiago-Gonzalez's upbringing in Puerto Rico, and it emphasized his having spent his formative years in a dangerous residential area known for frequent gun violence and gang activity. Santiago-Gonzalez, the eldest of eleven children, primarily lived with his grandmother. However, he was frequently exposed to the unclean and unsafe conditions of his mother's nearby home. Drug users left matches and crack pipes in the home, and on multiple occasions, Santiago-Gonzalez's siblings started fires with matches that were left lying around. At least eight of his siblings were removed from the home by social services.

Witnesses testified that Santiago-Gonzalez was subjected to physical and sexual violence. His grandfather beat him with belts and wires. One of his sisters testified that she believed that Santiago-Gonzalez was sexually abused on a daily basis by various men who frequented their home. She recalled Santiago-Gonzalez complaining of anal pain, and she recalled seeing his bloody underwear. Moreover, Santiago-Gonzalez's brother told the defense mitigation specialist that

he beat up two boys after they admitted to sexually abusing Santiago-Gonzalez while being housed together in a juvenile detention facility.

Evidence offered relating to Santiago-Gonzalez's mental health revealed a lengthy history, including behaviors such as banging his head against the wall as a young child and engaging in substance abuse. He started taking Xanax at age five or six and experimented with cocaine, marijuana, valium, and inhalant thinner at age nine. Santiago-Gonzalez attempted suicide by hanging at age ten after being released from a juvenile detention facility. Multiple family members, including Santiago-Gonzalez's father, engaged in various acts of self-harm.

The earliest psychological report obtained by the defense was generated in 1990 when Santiago-Gonzalez was nine years old. The report stated that Santiago-Gonzalez was a victim of neglect, abuse, and environmental deprivation. A neurology report also noted that he appeared to be malnourished and short for his age.

The defense presented two psychologists, Dr. Steven Gold and Dr. Michele Quiroga. Dr. Gold opined that at the time of the stabbing, Santiago-Gonzalez satisfied two statutory mitigating circumstances. He concluded that: (1) Santiago-Gonzalez was under the influence of extreme mental or emotional disturbance, and (2) Santiago-Gonzalez's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

Dr. Gold also concluded that Santiago-Gonzalez's home environment exposed him to ten adverse childhood experiences (ACEs).[3] Dr. Gold testified that ACEs often have a permanent effect on functioning, can physically alter the brain, and can, in individuals with four or more ACEs, shorten life expectancy by an average of twenty years relative to someone who has none of the factors. Dr. Gold testified that Santiago-Gonzalez suffers from substance abuse disorder, post-traumatic stress disorder (PTSD), complex PTSD, decreased ability to think ahead, greater emotionality and impulsivity that may include explosive anger, changes in consciousness, and forgetfulness. He also concluded that Santiago-Gonzalez meets the criteria for bipolar disorder, major depressive disorder, antisocial personality disorder, and possibly borderline personality disorder. He observed that Santiago-Gonzalez attempted suicide multiple times, possibly beginning before age nine, and he believed that most of the suicide attempts were genuine and not efforts to get attention.

---

3. Dr. Gold testified that Santiago-Gonzalez showed evidence of (1) physical abuse, (2) verbal abuse, (3) physical neglect, (4) emotional neglect, (5) domestic violence, (6) substance abuse, (7) family mental illness, (8) parental figure loss, and (9) family members who were incarcerated. Dr. Gold concluded that Santiago-Gonzalez satisfied nine out of ten ACEs and remarked that such a result is "extremely unusual." At Santiago-Gonzalez's request, ACE number (10), childhood sexual abuse, was not discussed in detail during Dr. Gold's testimony. However, Dr. Gold testified that evidence supported such a finding.

Dr. Michele Quiroga, a psychologist with a clinical neuropsychology subspecialty, opined that Santiago-Gonzalez's actual IQ score was 74 and indicative of borderline intellectual functioning.

*State's Rebuttal*

In rebuttal, the State offered the testimony of Dr. Tonia Werner, a psychiatrist, and Dr. Michael Kerkov, a psychologist. Dr. Werner testified that according to Santiago-Gonzalez, he tied up Burns and stabbed him after Burns grabbed his rear end. Santiago-Gonzalez also said that he wanted Burns to suffer and knew that Burns would die.

Dr. Werner diagnosed Santiago-Gonzalez with antisocial personality disorder and mood disorder. However, she ruled out PTSD because he denied being sexually abused and stated he did not remember being abused. Dr. Werner also testified that Santiago-Gonzalez did not meet the full criteria of borderline personality disorder but did exhibit self-injurious behavior consistent with that diagnosis. She also contradicted Dr. Gold's conclusions regarding the two statutory mitigating circumstances presented by the defense.

Dr. Kerkov reviewed the raw data compiled by Dr. Quiroga related to Santiago-Gonzalez's cognitive functioning. He disputed the data on which Dr. Quiroga relied and opined there was no indication that Santiago-Gonzalez had any relevant cognitive impairment.

## Conviction and Sentence

In April 2018, following the combined penalty phase and *Spencer* hearing, Santiago-Gonzalez was adjudicated guilty of first-degree murder and sentenced to death.

*Aggravating Factors*

The trial court found the existence of four aggravating factors and assigned weight as follows: (1) the capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment (great weight); (2) prior violent felony (great weight); (3) the capital felony was especially heinous, atrocious, or cruel (HAC) (very great weight); and (4) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (very great weight).

*Statutory Mitigation*

The court found as follows with respect to the two statutory mitigating circumstances argued by the defense: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance (not proven); (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (not proven).

*Nonstatutory Mitigation*

The trial court made the following findings with respect to fifty-five nonstatutory mitigating circumstances, ranging from not proven to moderate weight: (1) the defendant suffers from severe developmental trauma (not proven); (2) impact of life in Luis Llorens Torres housing (moderate weight); (3) the defendant was the product of statutory rape (very little weight); (4) the defendant's father was absent (very little weight); (5) the defendant's mother was intellectually disabled (very little weight); (6) the defendant's mother's impaired parenting skills (very little weight); (7) the defendant's mother abandoned him (little weight); (8) the defendant's grandfather was violent and abusive (very little weight); (9) the defendant's grandfather was a pedophile (very little weight); (10) the defendant's grandmother failed to protect children (very little weight); (11) the defendant's sexual abuse in the Llorens Community (moderate weight); (12) the defendant's early drug use (very little weight); (13) the defendant's lack of childhood health (very little weight); (14) the defendant's mental illness as a child (very little weight); (15) the home of the defendant's mother (very little weight); (16) the defendant's mother was a prostitute (very little weight); (17) the defendant's siblings were neglected (very little weight); (18) the defendant was placed in juvenile detention at age nine (moderate weight); (19) the defendant experienced sexual abuse in juvenile detention (moderate weight); (20) the death of the

defendant's grandmother (little weight); (21) the defendant's placement with his aunt Gloria as a child (not proven); (22) the defendant's placement with his aunt Maria as a child (not proven); (23) the defendant's lack of education (very little weight); (24) the defendant saved his brother's life (very little weight); (25) the defendant's exposure to violent crimes (moderate weight); (26) the impact of the loss of Santiago-Gonzalez's protective cousin, nicknamed "Luis Llorens" (very little weight); (27) the defendant's opiate addiction as a child (very little weight); (28) the defendant was a victim of violent crime (very little weight); (29) the death of the defendant's father (very little weight); (30) the defendant's family history of drug and alcohol abuse (some weight); (31) the defendant's family history of being victims of violent crimes (some weight); (32) the defendant's family history of criminal behavior (moderate weight); (33) the defendant's family health issues (very little weight); (34) the defendant's family history of mental illness (moderate weight); (35) the defendant's family history of suicide (moderate weight); (36) the defendant is bipolar (very little weight); (37) the defendant has clinical depression (some weight); (38) the defendant has PTSD (very little weight); (39) the defendant has complex PTSD (very little weight); (40) the defendant has borderline personality disorder (very little weight); (41) the defendant has antisocial personality disorder (very little weight); (42) the defendant's Baker Act hospitalizations (very little weight); (43) the defendant uses psychotropic

medication (very little weight); (44) the defendant has a history of suicide attempts (very little weight); (45) the defendant has a history of self-harm (very little weight); (46) the defendant is an artist (very little weight); (47) the defendant's lifetime of institutionalization (little weight); (48) the defendant was sexually assaulted by victim Donald Burns (not proven); (49) the defendant was the victim of a lewd act by victim Donald Burns (not proven); (50) the defendant pled to first-degree murder (little weight); (51) the defendant waived a jury recommendation on sentencing (little weight); (52) the defendant's courtroom behavior (little weight); (53) the love of Santiago-Gonzalez's family (little weight); (54) other factors in character, background, or life (not proven); (55) other factors in the circumstances of the offense (not proven).

## ANALYSIS

Santiago-Gonzalez raises ten issues in this direct appeal. Additionally, the scope of our mandatory review requires us to determine whether his guilty plea was knowingly, intelligently, and voluntarily entered.

### I. Competency

In determining whether a defendant is competent to proceed, the test is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Hill v. State*, 473

So. 2d 1253, 1257 (Fla. 1985) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)). Santiago-Gonzalez argues that the trial court deprived him of due process by accepting his guilty plea while he was incompetent. The scope of our review is whether the trial court abused its discretion by (1) not conducting a competency hearing, and (2) finding Santiago-Gonzalez competent to proceed.

In June 2016, given Santiago-Gonzalez's desire to plead guilty to first-degree murder against the advice of counsel, the trial court appointed two experts, Dr. William Meadows and Dr. Almari Ginory, to conduct competency evaluations. The court's order began as follows:

> THIS CAUSE is before the Court after the Defendant's announcement that he wants to plead guilty to a capital crime against his attorney's advice and the defense attorney's suggestion that a competency evaluation might be in order under Fla. R. Crim. P. 3.210(b), and, further, the Court having reasonable grounds to believe that the defendant may be incompetent to proceed and that experts should be appointed to examine and evaluate this defendant, it is ORDERED AND ADJUDGED as follows: [language appointing experts].

The order required that the experts' written reports be submitted by July 22, 2016, and also indicated that "[p]ursuant to Rule 3.210(b), Florida Rules of Criminal Procedure, a hearing to determine the defendant's mental condition shall be held on (to be set by separate order) at 9:30 a.m. in the Circuit Court of Union County, Union County Courthouse." Subsequently, Dr. Ginory evaluated Santiago-Gonzalez on July 6, 2016, and Dr. Meadows evaluated him on July 15, 2016.

Dr. Ginory and Dr. Meadows evaluated Santiago-Gonzalez's competency pursuant to the criteria set for in rule 3.211(a), Florida Rules of Criminal Procedure. Both doctors concluded that Santiago-Gonzalez was competent to proceed and set forth their findings in written reports.

Both competency reports discussed Santiago-Gonzalez's extensive psychiatric history which dates back to age nine and includes two psychiatric hospitalizations while living in Puerto Rico; a history of treatment with psychotropic medications; diagnoses of adjustment disorder, antisocial personality disorder, depressive disorder, bipolar disorder, and bipolar disorder with psychotic features; and a history of self-harm and suicide attempts. Dr. Meadows also noted that Santiago-Gonzalez sustained "head trauma due to a gunshot wound in 2002. There were no indications of any persisting neurocognitive problems." Additionally, Dr. Meadows stated that in a different legal matter in 2010, he evaluated Santiago-Gonzalez for competency and concluded that "Mr. Santiago-Gonzalez was malingering psychotic disturbances and was not exhibiting active psychiatric disturbances."

While both competency reports mentioned that Santiago-Gonzalez engaged in acts of self-harm, Dr. Ginory's report also provided the following detail:

> **Medical History:** He has had multiple episode[s] of self-injurious behavior and suicide attempts since incarcerated. These attempts have range[d] from cutting himself to swallowing objects. This has resulted in over 40 procedures, numerous hospitalizations, a blood

clot in his right arm, and breathing difficulties. His most recent surgery was three weeks prior. He reports the reason he harms himself is over frustration. He gets angry and no way to express this anger and so he harms himself. Only on a few of these instances was he trying to kill himself.

Despite these behaviors that Dr. Ginory concluded were consistent with antisocial personality disorder, he concluded that "Mr. Santiago does have an adequate understanding of the proceeding and does have the ability to participate effectively in his own defense. As such, I opine that Mr. Angel Santiago is competent to proceed." Similarly, Dr. Meadows agreed with the diagnosis of antisocial personality disorder and also noted that Santiago-Gonzalez is not intellectually disabled, his bipolar disorder was in remission, and no psychiatric disturbances were exhibited in the examination. Dr. Meadows concluded:

Mr. Santiago-Gonzalez has the ability to appreciate these charges and the nature of the judicial process. He also has the capacity to consult with his attorney in a rational manner and he can testify relevantly. Mr. Santiago-Gonzalez is capable of entering a plea in this case and to appreciate the potential sanctions that he is facing. Based on the information available and the defendant's presentation, it is the opinion of this examiner that Mr. Santiago-Gonzalez is Competent to Proceed.

After receiving these reports, the trial court did not set a competency hearing. Rather, Santiago-Gonzalez's case proceeded to the change of plea hearing on August 15, 2016. At that hearing, defense counsel did not challenge the experts' conclusions that Santiago-Gonzalez was competent to proceed. The following discussion took place:

THE COURT: All right. State, if you'll give me a factual basis for the plea.

MR. KRAMER [Prosecutor]: Your Honor, I will. Before we do that, I would ask—before this hearing was held, the Court ordered two psychological evaluations to determine Mr. Santiago's competency to enter this plea. Mr. Chipperfield and I have discussed allowing the Court to receive the evaluations that were conducted and the written reports of them as evidence in this case and ask the Court to make a determination of his competence based upon those reports prior to the Court accepting the plea. So if we could address that issue prior to me giving you a factual basis and you accepting that factual basis and the plea.

MR. CHIPPERFIELD [Defense Counsel]: Your Honor, Mr. Kramer is right. We have reviewed those reports. Mr. Santiago is aware of the contents. We've discussed that with him. And we don't require any additional testimony besides the reports, and we stipulate to the reports being received in evidence on the issue of competency to enter this plea. And based on our conversations with Mr. Santiago, he feels the same way.

THE COURT: So you're referring to Dr. Ginory's report and Dr. Meadows's report; correct?

MR. KRAMER: That is correct, your Honor.

THE COURT: I've previously reviewed both reports, and both reports are currently in the court file. Do you wish to mark additional copies of the report for evidence?

MR. KRAMER: Your Honor, there has never, in my opinion, been a suggestion that Mr. Santiago is incompetent; however, in an abundance of caution, because the Court felt it necessary to have him evaluated, we the State is [sic] asking that you receive them as evidence of his competency and make a ruling that he is competent today to enter this plea.

THE COURT: So when I was aware that Mr. Santiago wanted to enter a plea and he wanted to request the death penalty, I was made aware

- 27 -

that he had a history of mental illness. Competency has never been an issue in this case, but because of the seriousness of the offense, I went ahead and ordered Mr. Santiago to be evaluated. And I based part of that on the Ricardo Gill case, which I have reviewed the Supreme Court order in that appeal. I don't have the case in front of me for a citation, but Judge Cates did something similar in that case. Since competency is not at issue, I don't think I have to have a formal competency hearing. I find that there's competent and substantial evidence based on the doctors' reports, my interaction with the defendant, and the attorneys not expressing any concern regarding the defendant's competence. That evidence supports the finding that the defendant, who has a history of mental illness, is competent to enter a knowing, intelligent, and voluntary plea here today. Anything else anybody wants to put on the record at this point regarding that issue?

MR. KRAMER: No, your Honor. That covers it from the State's perspective.

MR. CHIPPERFIELD: Nothing from the defense, your Honor.

MR. KRAMER: Factual basis?

THE COURT: Yes, please.

After the factual basis was established, the trial court proceeded to conduct the plea colloquy.

Given the trial court's own observations, the detailed expert reports from Dr. Meadows and Dr. Ginory, and the uncontested conclusions from both experts that Santiago-Gonzalez was competent to proceed, the trial court did not abuse its discretion in ruling as such. Moreover, the trial court did not abuse its discretion by not conducting a competency hearing where (1) the court appointed two experts to examine Santiago-Gonzalez and evaluate his competence to proceed, (2) both

- 28 -

experts concluded in written reports that Santiago-Gonzalez was competent, (3) the trial court and the parties agreed that Santiago-Gonzalez was competent, and (4) defense counsel stipulated to the admissibility of the experts' reports and declined to offer additional testimony on the subject.

In *Fowler v. State*, 255 So. 2d 513, 515 (Fla. 1971), this Court stated:

> We concur that where the parties and the judge agree, the trial Court may decide the issue of competency on the basis of the written reports alone. But where . . . there are reasonable grounds to believe defendant insane, *and* defense counsel requests a hearing, it is error not to provide such a hearing.

In the present case, the parties and the trial court agreed that Santiago-Gonzalez was competent to proceed. Both court-appointed experts agreed as to his competency and set forth their conclusions in detailed written reports. Moreover, defense counsel stipulated to the admissibility of the experts' reports, did not request a hearing, and did not want to offer additional testimony prior to the plea. Under these circumstances, the trial court did not abuse its discretion in not conducting a competency hearing, nor did it err in finding Santiago-Gonzalez competent to proceed.

## II. New Competency Evaluation

Santiago-Gonzalez also argues that the trial court erred in failing to order a new competency evaluation before the penalty phase began. He asserts that incidents that occurred in the months leading up to the penalty phase provided

reasonable grounds for the trial court to question his competency. However, the State argues that the trial court was not obligated to reevaluate competency. We agree that the trial court was not required to evaluate Santiago-Gonzalez's competency anew.

Santiago-Gonzalez argues that signs of his incompetency began as soon as August 16, 2016, the day after the guilty plea. On that day, he wrote a letter to the trial court accusing the mental health assistant warden of taking his mail and other personal property. Additionally, he points to conduct in October 2016, when he wrote another letter to the trial court, this time stating that he was not committing acts of self-harm to kill himself but rather to obtain a discharge from the mental health treatment facility where he resided. The letter read: "I've been hurting myself because I have been trying to get discharge [sic] from this place (mental health) and the mental health's doctors been playing games, so, I do that to make them spend a lot of money on me in hospitals. (Like a payback.)." He continued:

> I am not crazy, I do not belong here! I am in my five senses and I really want to get over with this case!! To be 100% straight/honest with you. . . I won't change my ways! Because I will keep doing what I do, and killing people if I have to! Remember, I already have a bunch of life sentences and 300 years to do in prison!
> I don't really have nothing to lose!! [A]nd I don't care who I hurt or kill anymore.

He further stated: "I have zero remorce [sic] for my crime and crimes. You know, the State have not only one aggravator, but, a bunch of aggravators against me, to

make me elegible [sic] for a death sentence!!  That's the only way I will stop stabbing people."

On October 21, 2016, the trial court entered a commitment order for continuing treatment because Santiago-Gonzalez refused voluntary treatment and "poses a real and present threat of substantial harm to himself or others."  An essential treatment order request completed in January 2017 found him "clinically incompetent to consent to treatment."  The request noted a diagnosis of borderline personality disorder and observed the following regarding recent incidents:

> Mr. Santiago-Gonzalez continues to inflict serious harm on his body. Pt was admitted to the self-harm observation unit on 10/1, 10/15, and 11/30.  On 10/16, pt was transported to Jacksonville Memorial for surgical evaluation to treat self-injury to the abdomen.  On another occasion, 11/8, pt was transported to Dr. Bennett for surgical care following a 2 by 2" self-inflicted wound to his mid-abdomen.  Finally on 12/20, pt was transported to Jacksonville Memorial Hospital following insertion of a pen into his abdomen.  Pt recurrent self-injury poses a risk of permanent disability or death.

The following summer, in July 2017, Santiago-Gonzalez had been recently ordered into a mental health treatment facility for six months, during which time he was to receive "court ordered medications to psychiatrically stabilize."  At a July 17, 2017, motion hearing, defense counsel advised the court that Santiago-Gonzalez was taking several psychotropic medications.

Santiago-Gonzalez also states that he had an "outburst" during that hearing. While discussing penalty phase scheduling, the following exchange with the trial court occurred:

> THE COURT: Okay. So knowing that, what I'm going to do is I'm going to set this for a firm trial date starting February the 5th. Okay?
>
> THE DEFENDANT: Fuck.
>
> THE COURT: We are going to block off three weeks.
>
> THE DEFENDANT: I'm not waiting until February, man. I don't want no jury. Fuck all this. Y'all lied to me, man. Y'all lying to me.
>
> THE COURT: So, Mr. Santiago
>
> THE DEFENDANT: They lied to me, Your Honor.
>
> THE COURT: Mr. Santiago –
>
> THE DEFENDANT: They told me it was in August, something like that. I want to get done with this thing.
>
> THE COURT: Mr. Santiago –
>
> THE DEFENDANT: I don't want to wait until February, Your Honor.
>
> THE COURT: Let me talk to you a moment. Okay?
>
> THE DEFENDANT: I bet they're going to shoot me today, if you need it, man.
>
> THE COURT: Your attorneys have argued that you should be able to go to trial in August. The State is the one that has asked for a continuance. I'm the one who has decided to make the February term, not your attorneys.

THE DEFENDANT: They told me if I pick the jury, I'm still going in August. Now it's not what it was.

THE COURT: So

THE DEFENDANT: See? I waive my penalty. I don't want no jury now, period. I don't want to talk to them, period.

THE COURT: So, Mr. –

THE DEFENDANT: I ain't crazy. I waive my penalty phase, everything, everything here.

THE COURT: So, Mr. –

THE DEFENDANT: I want to waive everything right here. I'm not going to change my mind no more.

THE COURT: So, Mr. Santiago, let me talk to you a moment. Ultimately, you can decide to waive the jury if you want to. Either way, the prosecutor says they're not going to be ready before February to argue that you should get the death penalty.

I'm the one – your attorneys can't control me. I'm like an umpire in a baseball game, okay? They can't control what I decide. I've decided that I'm going to give the State until February to make their strongest argument that you can get the death penalty and give your attorneys the strongest argument that they can make that you shouldn't get it.

Come February 5th I'm going to have a jury here, okay? You can come in February 5th and start selecting that jury and go forward with the jury trial. You can come in February 5th and say, "Judge, I don't want the jury anymore; I just want you, and I waive it." Either way, my intention would be to start the process. Okay?

So I'm going to have both ready to go. Either you just have a judge, or you have a jury decide. It will be up to you and your attorneys to discuss. Okay, sir?

All right. So February 5th will be the trial. Block out at least three weeks on your calendar. And I would keep your calendar light for the fourth week in case we go into the fourth week. Okay?

That being said, we need to get back at least for some case management and some more time to argue additional motions.

Santiago-Gonzalez continued to be treated for mental illness and self-harm. On December 13, 2017, a mental health treatment order noted a diagnosis of bipolar disorder, mixed severe with psychotic features, and indicated: "Continues to engage in self-injurious behaviors required multiple emergency air-flight to trauma center, most recently as of 12/12/17." There was no motion for a new competency evaluation, and the penalty phase began on February 5, 2018. At the beginning of the penalty phase, the trial court engaged in another detailed colloquy with Santiago-Gonzalez to ensure a valid waiver of a penalty phase jury.

Ensuring a defendant's competency is a continuing obligation of the court. *See Nowitzke v. State*, 572 So. 2d 1346, 1349 (Fla. 1990). "Once a defendant is declared competent, the trial court must still be receptive to revisiting the issue if circumstances change. However, only if bona fide doubt is raised as to a defendant's mental capacity is the court required to conduct another competency proceeding." *Hunter v. State*, 660 So. 2d 244, 248 (Fla. 1995) (citing *Pericola v. State*, 499 So. 2d 864, 867 (Fla. 1st DCA 1986)). Moreover, "[a] presumption of competence attaches from a previous determination of competency to stand trial." *Id*. (citing *Durocher v. Singletary*, 623 So. 2d 482, 484 (Fla. 1993)).

Santiago-Gonzalez relies on his ongoing history of mental illness and self-injurious behavior as a basis for concluding that he was incompetent to plead guilty and to proceed to the penalty phase.

The State articulates several reasons why the trial court did not abuse its discretion in refusing to order a new competency evaluation before the penalty phase:

> (1) Appellant was competent to proceed and enter a guilty plea, despite his history of mental illness; (2) his defense team never challenged or raised a concern about his competency; (3) Appellant never acted unusually or inappropriately in the courtroom; (4) the trial court had many opportunities to observe his demeanor and behavior; (5) Appellant always responded intelligently and appropriately to the trial court and his counsel; (6) throughout the proceedings, Appellant exhibited rational thought; (7) no materially new information was presented to or observed by the trial court; and (8) the trial court had no reasonable basis or bona fide doubt as to Appellant's competency.

The trial court did not err in proceeding to the penalty phase without ordering a new competency evaluation.

### III. Competency

Santiago-Gonzalez asserts that his case must be remanded to the trial court for the entry of a written nunc pro tunc order finding him competent to proceed. Although this Court has read Florida Rule of Criminal Procedure 3.212(b) as requiring issuance of a written order of competency, *see Mullens v. State*, 197 So. 3d 16, 38 (Fla. 2016); *Dougherty v. State*, 149 So. 3d 672, 679 (Fla. 2014), the failure to enter a written order was not brought to the trial judge's attention and

should therefore be remediable on appeal only if the failure constitutes fundamental error. *See, e.g.*, *Calloway v. State*, 210 So. 3d 1160, 1191 (Fla. 2017) ("Unpreserved errors . . . are reviewed for fundamental error.").[4] Given the trial court's oral competency finding in this case, which is fully supported by the record, Santiago-Gonzalez has not demonstrated fundamental error and is therefore not entitled to relief on this issue. *See id.* ("Fundamental error must amount to a denial of due process, and consequently, should [only] be found to apply where prejudice follows.").[5]

## IV. Proportionality

In determining whether Santiago-Gonzalez's death sentence is a proportionate penalty, this Court performs a comprehensive review of each case in which the death sentence is imposed to determine whether the crime is among both the most aggravated and the least mitigated of murders. *Urbin v. State*, 714 So. 2d

---

4. Although *Calloway* was specifically addressing unpreserved errors "made in closing statements," 210 So. 3d at 1191, a party claiming error in failing to strictly follow the dictates of a procedural rule should not be held to a lesser standard.

5. In *Mullens*, the Court did not address preservation, and therefore, did not discuss the applicability of the fundamental error standard of review. Similarly, in *Dougherty*, this Court did not address the fundamental error standard of review. Although unpreserved, Dougherty's claim that the trial court did not enter a written order of competency was procedurally barred because Dougherty did not raise the issue on direct appeal. 149 So. 3d at 676.

411, 416 (Fla. 1998) (citing *State v. Dixon*, 283 So. 2d 1, 7 (Fla. 1973)).  This

review consists of a qualitative, rather than a quantitative analysis of the basis for

each aggravating and mitigating circumstance.  *Id.*  "Further, in a proportionality

analysis, this Court will accept the weight assigned by the trial court to the

aggravating and mitigating factors."  *Hayward v. State*, 24 So. 3d 17, 46 (Fla.

2009).

Santiago-Gonzalez argues that the death penalty is not a proportionate

sentence because he was sexually abused as a child and was sexually assaulted by

Burns before the stabbing.  However, the trial court properly rejected the claim of

sexual assault by Burns as a mitigating circumstance where there was competent,

substantial evidence to do so.  At the time that Santiago-Gonzalez stabbed Burns at

least sixty-four times, Burns was tied up and unable to defend himself.  Moreover,

Santiago-Gonzalez asked to be placed in Burns' cell and brought a concealed

homemade knife with him.  "[F]inding or not finding a specific mitigating

circumstance applicable is within the trial court's domain, and reversal is not

warranted simply because an appellant draws a different conclusion."  *Cook v.

State*, 542 So. 2d 964, 971 (Fla. 1989) (quoting *Stano v. State*, 460 So. 2d 890, 894

(Fla. 1984)).  The trial court's finding as a mitigating circumstance that Santiago-

Gonzalez was sexually abused as a child does not render his death sentence

disproportionate.

Santiago-Gonzalez's sentence is proportionate to other cases where the defendant stabbed the victim multiple times. In *Guardado v. State*, 965 So. 2d 108, 119 (Fla. 2007), this Court upheld the death sentence as proportionate where the trial court found five aggravators, including prior violent felony, HAC, and CCP, no statutory mitigators, and nineteen nonstatutory mitigators. *Id.* at 112. In *Duest v. State*, 855 So. 2d 33 (Fla. 2003), the victim was also stabbed multiple times; the trial court found multiple aggravators including prior violent felony and HAC, no statutory mitigators, and twelve nonstatutory mitigators. *Id.* at 47. This Court in *Duest* noted that similar to the present case, there was no statutory mitigation, there was strong "evidence of an intentional killing," and there was a defenseless victim who was stabbed in the back. *Id.* at 48.

Santiago-Gonzalez suggests that his case is similar to *Morgan v. State*, 639 So. 2d 6 (Fla. 1994). There, despite the defendant having stabbed the victim sixty times, this Court concluded that the death penalty was disproportionate due to the defendant's age of sixteen years and the fact that he sniffed gasoline. *Id.* at 14. However, as Santiago-Gonzalez concedes, he was not a teenager at the time of Burns' murder. Instead, he was a 33-year-old man with a lengthy prison record for a host of violent crimes. Second, there were two aggravating factors in *Morgan*: (1) murder during the course of a felony, and (2) HAC. In contrast, Santiago-Gonzalez was sentenced to death upon a finding of four aggravating factors:

(1) murder committed while under sentence of imprisonment; (2) prior violent felony, (3) HAC, and (4) CCP. Three of these factors (prior violent felony, HAC, and CCP) have repeatedly been identified as among the weightiest in Florida's death penalty scheme. *See Damas v. State*, 260 So. 3d 200, 216 (Fla. 2018); *Larkins v. State*, 739 So. 2d 90, 95 (Fla. 1999).

Similarly, Santiago-Gonzalez's reliance on *Nibert v. State*, 574 So. 2d 1059 (Fla. 1990), is misplaced. In that case, this Court found the death sentence disproportionate despite multiple stabbings and a finding of HAC. *Id.* at 1061. However, *Nibert* is a single-aggravator case and is far less aggravated than Santiago-Gonzalez's case. Moreover, this Court concluded in *Nibert* that the trial court improperly rejected evidence that Nibert was under extreme mental or emotional disturbance and that his capacity to control his behavior was substantially impaired. *Id.* at 1062-63. The serious aggravating factors far outweigh the mitigating circumstances in this case, and Santiago-Gonzalez's death sentence is proportionate to other cases involving similar factual circumstances and similar aggravating factors and mitigating circumstances.

## V. Nexus Between Mitigation and the Murder

Santiago-Gonzalez argues that the trial court improperly required a nexus between certain mitigating circumstances and the murder of Burns. However, this argument has no merit.

"Although a trial court cannot require a nexus between the crime and mitigating evidence, the court may place mitigating evidence in context." *Fletcher v. State*, 168 So. 3d 186, 219 (Fla. 2015) (citing *Martin v. State*, 107 So. 3d 281, 318 (Fla. 2012)). Santiago-Gonzalez is not entitled to relief.

## VI. Elements of Capital Murder

Santiago-Gonzalez argues that the trial court's finding that the aggravating factors outweigh the mitigating circumstances is an "element" that must be found beyond a reasonable doubt. Because the sentencing order did not make an express finding "beyond a reasonable doubt," he maintains that his death sentence is invalid. This argument is without merit.

"[S]ubsequent to our decision in *Hurst v. State* [202 So. 3d 40 (Fla. 2016)], we already have receded from the holding that the additional *Hurst v. State* findings are elements." *State v. Poole*, 45 Fla. L. Weekly S41, S47 (Fla. Jan. 23, 2020), *clarified*, 45 Fla. L. Weekly at S141 (Fla. Apr. 2, 2020). In *Rogers v. State*, 285 So. 3d 872, 885-86 (Fla. 2019), we clarified:

> To the extent that in *Perry v. State*, 210 So. 3d 630, 633 (Fla. 2016), we suggested that *Hurst v. State* held that the sufficiency and weight of the aggravating factors and the final recommendation of death are elements that must be determined by the jury beyond a reasonable doubt, we mischaracterized *Hurst v. State*, which did not require that these determinations be made beyond a reasonable doubt. Since *Perry*, in *In re Standard Criminal Jury Instructions in Capital Cases* [244 So. 3d 172 (Fla. 2018] and *Foster*, we have implicitly receded from its mischaracterization of *Hurst v. State*. We now do so explicitly. Thus, these determinations are not subject to the beyond a

- 40 -

reasonable doubt standard of proof, and the trial court did not err in instructing the jury.

The sentencing order sets forth the trial court's conclusions that the State proved four aggravating factors beyond a reasonable doubt, and "the aggravating circumstances in this case far outweigh the mitigating circumstances." There is no deficiency in the trial court's findings.

## VII. CCP

Santiago-Gonzalez challenges the trial court's finding that the murder of Burns was cold, calculated, and premeditated without pretense of moral or legal justification (CCP).

> In order to establish the CCP aggravator, the evidence must show: (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; (3) "the defendant exhibited heightened premeditation (premeditated)"; (4) "the defendant had no pretense of moral or legal justification."

*Williams v. State*, 37 So. 3d 187, 195 (Fla. 2010) (quoting *Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007)); see § 921.141(6)(i), Fla. Stat. (2018). The trial court's finding of this aggravating factor is reviewed for competent, substantial evidence. *See England v. State*, 940 So. 2d 389, 403 (Fla. 2006). "A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances." *Gill v. State*, 14 So. 3d 946, 962 (Fla. 2009) (citing *Hudson v.*

*State*, 992 So. 2d 96, 116 (Fla. 2008)). In this case, competent, substantial evidence supports the trial court's finding.

On the day of the murder, Santiago-Gonzalez arranged to be placed in Burns' cell, ostensibly to obtain help with legal matters. Santiago-Gonzalez and Burns were previously inmates in the Santa Rosa Correctional Institution, and Santiago-Gonzalez was aware that Burns was a convicted sex offender who was imprisoned for committing acts against minors.

That evening, Santiago-Gonzalez tore a sheet into multiple pieces for the purpose of restraining Burns. Then, Santiago-Gonzalez either forced Burns to be tied up or convinced Burns to allow himself to be tied up. After restraining Burns, Santiago-Gonzalez began repeatedly stabbing him with a homemade knife that he snuck into the cell. These actions satisfy the definition of cold, calculated, and premeditated.

Moreover, there was no pretense of moral or legal justification. Burns was brutally stabbed while restrained and completely unable to defend himself. The trial court's finding of this aggravating factor is supported by competent, substantial evidence.

## VIII. HAC

Santiago-Gonzalez also argues that there was insufficient evidence to justify the trial court's finding that the murder of Burns was especially heinous, atrocious, and cruel (HAC). This Court has said:

> The HAC aggravator applies only in torturous murders—those that evince extreme and outrageous depravity as exemplified either by the desire to inflict a high degree of pain or utter indifference to or enjoyment of the suffering of another. *Kearse v. State*, 662 So. 2d 677 (Fla. 1995); *Cheshire v. State*, 568 So. 2d 908 (Fla. 1990). The crime must be conscienceless or pitiless and unnecessarily torturous to the victim. *Richardson v. State*, 604 So. 2d 1107 (Fla. 1992); *Hartley v. State*, 686 So. 2d 1316 (Fla. 1996).

*Guzman v. State*, 721 So. 2d 1155, 1159 (Fla. 1998).

"In determining whether the HAC factor was present, the focus should be upon the victim's perceptions of the circumstances as opposed to those of the perpetrator." *Lynch v. State*, 841 So. 2d 362, 369 (Fla. 2003). Moreover, "the evidence must show that the victim was conscious and aware of impending death." *Douglas v. State*, 878 So. 2d 1246, 1261 (Fla. 2004) (citing *Zakrzewski v. State*, 717 So. 2d 488, 493 (Fla. 1998)).

In particular, Santiago-Gonzalez argues that there was insufficient evidence that Burns suffered a sufficient amount of pain to warrant a finding of HAC, and that Burns could not have had an imminent fear of death because he allowed himself to be tied up. These arguments are completely without merit, and competent, substantial evidence supports the trial court's finding of HAC.

In concluding that the murder of Burns satisfied the HAC aggravator, the trial court stated:

> The evidence in this case reflects that the victim was stabbed at least 64 times while conscious and with his hands and feet bound. After the stabbing the victim remained conscious for several minutes, in extreme pain, and acutely aware of the fatal nature of his wounds, as evidenced by the hopelessness in his statements to Nurse Dukes and Captain Ficken. Moreover, the Defendant refused to allow correctional officers into the cell to help the victim until they began recording the aftermath of the incident, thereby prolonging the victim's pain and suffering as he laid bound in a pool of his own blood. Both during and after the merciless attack, the victim was faced with the reality that his death was imminent. And, the Defendant was totally indifferent to the victim's suffering.

The fact that Santiago-Gonzalez stabbed Burns a minimum of sixty-four times is highly relevant to this analysis. This Court has consistently concluded that a finding of HAC was appropriate in cases where the victim was repeatedly stabbed. *See Guardado v. State*, 965 So. 2d 108, 116-17 (Fla. 2007); *Guzman*, 721 So. 2d at 1159-60; *Finney v. State*, 660 So. 2d 674, 685 (Fla. 1995); *Pittman v. State*, 646 So. 2d 167, 173 (Fla. 1994); *Atwater v. State*, 626 So. 2d 1325, 1329 (Fla. 1993). Moreover, the extremely brutal, repeated stabbing of Burns—while Burns' hands and feet were bound—satisfies the requirement of "extreme and outrageous depravity as exemplified" by Santiago-Gonzalez's "utter indifference to or enjoyment of" Burns' suffering. *Guzman*, 721 So. 2d at 1159 (citing *Kearse*, 662 So. 2d 677; *Cheshire*, 568 So. 2d 908).

Santiago-Gonzalez's argument that the record does not demonstrate a sufficient level of pain and knowledge of impending death is soundly refuted by the record. The trial court's conclusions are supported by the testimony of the trauma surgeon who treated Burns, who testified that Burns experienced an "extreme level of pain and discomfort and required all of the aggressive support with pain medicine that we could give him." Moreover, the record contains testimony regarding Burns' own statements after he sustained no fewer than sixty-four stab wounds in the neck, chest, abdomen, and back. These statements revealed Burns' belief that he was going to die. Competent, substantial evidence supports the trial court's finding of HAC.

## IX. Eligibility for the Death Penalty

Santiago-Gonzalez argues that his death sentence is invalid because he did not plead to a crime that is eligible for the death penalty. He maintains that in order to be sentenced to death, the State must specifically allege in the indictment the aggravating factors that support a death sentence. This argument is without merit.

As Santiago-Gonzalez conceded in his initial brief, this Court has previously rejected this argument. In *Pham v. State*, 70 So. 3d 485, 496 (2011), this Court observed that it "has repeatedly rejected the argument that aggravating circumstances must be alleged in the indictment." This Court explained: "A

- 45 -

defendant is not entitled to notice of every aggravator in the indictment because the aggravators are clearly listed in the statutes. *Id.* (citing *Lynch v. State*, 841 So. 2d 362, 378 (Fla. 2003)).

## X. *Hurst v. Florida*

Santiago-Gonzalez contends that in light of the United States Supreme Court's decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), his plea to first-degree murder cannot constitutionally be punished by death. However, Santiago-Gonzalez waived a penalty phase jury. "[A] defendant who has waived the right to a penalty phase jury is not entitled to relief under *Hurst v. Florida*." *Davis v. State*, 207 So. 3d 177, 212 (Fla. 2016).

## XI. Sufficiency of the Evidence

This Court has a mandatory obligation to independently review the sufficiency of the evidence underlying Santiago-Gonzalez's conviction, and the "customary review" evaluates whether the conviction is supported by competent, substantial evidence. *Ocha v. State*, 826 So. 2d 956, 965 (Fla. 2002). However, where a defendant pleads guilty and waives a jury trial, the relevant inquiry is not whether there was competent, substantial evidence, but whether the defendant knowingly, intelligently, and voluntarily entered the guilty plea. *See Tanzi v. State*, 964 So. 2d 106, 121 (Fla. 2007). "Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his

- 46 -

plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily." *Ocha*, 826 So. 2d at 965 (citing *LeDuc v. State*, 365 So. 2d 149, 150 (Fla. 1978)).

The trial court properly conducted a lengthy plea colloquy at the change of plea hearing. This colloquy reflected Santiago-Gonzalez's understanding of the "consequences of his plea" and "the constitutional rights he was waiving as a result." *Russ v. State*, 73 So. 3d 178, 200 (Fla. 2011). Santiago-Gonzalez stated he understood that by pleading guilty to the murder of Burns, he would be punished by either death or life imprisonment. He also stated he understood that a guilty plea would waive the first phase of trial, leaving only the matter of punishment to be determined. The State provided a factual basis for the murder, to which the defense conceded for the purpose of the guilty plea. The trial court's detailed questioning and Santiago-Gonzalez's responses were sufficient to satisfy the requirement of a knowing, intelligent, and voluntary plea.

## CONCLUSION

For these reasons, we affirm Santiago-Gonzalez's conviction of first-degree murder and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, and MUÑIZ, JJ., concur.
COURIEL, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Union County,
     David P. Kreider, Judge - Case No 632014CF000080CFAXMX

Andy Thomas, Public Defender, and Megan Long, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

     for Appellant

Ashley Moody, Attorney General, and Janine D. Robinson, Assistant Attorney General, Tallahassee, Florida,

     for Appellee